# DAVIS, AS NEXT FRIEND OF LaSHONDA D. v. MONROE COUNTY BOARD OF EDUCATION ET AL.

No. 97–843.   Argued January 12, 1999—Decided May 24, 1999

630

632

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined, *post*, p. 654.

*Verna L. Williams* argued the cause for petitioner. With her on the briefs were *Marcia D. Greenberger, Leslie T. Annexstein, Nancy Perkins,* and *Stevenson Munro.*

*Deputy Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Beth S. Brinkmann, Dennis J. Dimsey,* and *Linda F. Thome.*

*W. Warren Plowden, Jr.,* argued the cause and filed a brief for respondents.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioner brought suit against the Monroe County Board of Education and other defendants, alleging that her fifth-grade daughter had been the victim of sexual harassment by another student in her class. Among petitioner's claims was a claim for monetary and injunctive relief under Title IX of

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Sara L. Mandelbaum* and *Steven R. Shapiro;* for the National Education Association et al. by *Judith L. Lichtman* and *Donna R. Lenhoff;* for the NOW Legal Defense and Education Fund et al. by *Martha F. Davis, Julie Goldscheid, Yolanda S. Wu, David S. Ettinger,* and *Mary-Christine Sungaila;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

Briefs of *amici curiae* urging affirmance were filed for the National School Boards Association et al. by *Lisa A. Brown, Jennifer Jacobs,* and *Julie Underwood;* and for Students for Individual Liberty et al. by *James A. Moody.*

*Richard P. Ward* and *Anita K. Blair* filed a brief for the Independent Women's Forum as *amicus curiae.*

the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.* The District Court dismissed petitioner's Title IX claim on the ground that "student-on-student," or peer, harassment provides no ground for a private cause of action under the statute. The Court of Appeals for the Eleventh Circuit, sitting en banc, affirmed. We consider here whether a private damages action may lie against the school board in cases of student-on-student harassment. We conclude that it may, but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities. Moreover, we conclude that such an action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

## I

Petitioner's Title IX claim was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. Accordingly, in reviewing the legal sufficiency of petitioner's cause of action, "we must assume the truth of the material facts as alleged in the complaint." *Summit Health, Ltd.* v. *Pinhas,* 500 U. S. 322, 325 (1991).

## A

Petitioner's minor daughter, LaShonda, was allegedly the victim of a prolonged pattern of sexual harassment by one of her fifth-grade classmates at Hubbard Elementary School, a public school in Monroe County, Georgia. According to petitioner's complaint, the harassment began in December 1992, when the classmate, G. F., attempted to touch LaShonda's breasts and genital area and made vulgar statements such as "'I want to get in bed with you'" and "'I want to feel your boobs.'" Complaint ¶ 7. Similar conduct allegedly occurred on or about January 4 and January 20, 1993. *Ibid.* LaShonda reported each of these incidents to her

mother and to her classroom teacher, Diane Fort. *Ibid.* Petitioner, in turn, also contacted Fort, who allegedly assured petitioner that the school principal, Bill Querry, had been informed of the incidents. *Ibid.* Petitioner contends that, notwithstanding these reports, no disciplinary action was taken against G. F. *Id.*, ¶ 16.

G. F.'s conduct allegedly continued for many months. In early February, G. F. purportedly placed a door stop in his pants and proceeded to act in a sexually suggestive manner toward LaShonda during physical education class. *Id.*, ¶ 8. LaShonda reported G. F.'s behavior to her physical education teacher, Whit Maples. *Ibid.* Approximately one week later, G. F. again allegedly engaged in harassing behavior, this time while under the supervision of another classroom teacher, Joyce Pippin. *Id.*, ¶ 9. Again, LaShonda allegedly reported the incident to the teacher, and again petitioner contacted the teacher to follow up. *Ibid.*

Petitioner alleges that G. F. once more directed sexually harassing conduct toward LaShonda in physical education class in early March, and that LaShonda reported the incident to both Maples and Pippen. *Id.*, ¶ 10. In mid-April 1993, G. F. allegedly rubbed his body against LaShonda in the school hallway in what LaShonda considered a sexually suggestive manner, and LaShonda again reported the matter to Fort. *Id.*, ¶ 11.

The string of incidents finally ended in mid-May, when G. F. was charged with, and pleaded guilty to, sexual battery for his misconduct. *Id.*, ¶ 14. The complaint alleges that LaShonda had suffered during the months of harassment, however; specifically, her previously high grades allegedly dropped as she became unable to concentrate on her studies, *id.*, ¶ 15, and, in April 1993, her father discovered that she had written a suicide note, *ibid.* The complaint further alleges that, at one point, LaShonda told petitioner that she "'didn't know how much longer she could keep [G. F.] off her.'" *Id.*, ¶ 12.

Nor was LaShonda G. F.'s only victim; it is alleged that other girls in the class fell prey to G. F.'s conduct. *Id.*, ¶ 16. At one point, in fact, a group composed of LaShonda and other female students tried to speak with Principal Querry about G. F.'s behavior. *Id.*, ¶ 10. According to the complaint, however, a teacher denied the students' request with the statement, "'If [Querry] wants you, he'll call you.'" *Ibid.*

Petitioner alleges that no disciplinary action was taken in response to G. F.'s behavior toward LaShonda. *Id.*, ¶ 16. In addition to her conversations with Fort and Pippen, petitioner alleges that she spoke with Principal Querry in mid-May 1993. When petitioner inquired as to what action the school intended to take against G. F., Querry simply stated, "'I guess I'll have to threaten him a little bit harder.'" *Id.*, ¶ 12. Yet, petitioner alleges, at no point during the many months of his reported misconduct was G. F. disciplined for harassment. *Id.*, ¶ 16. Indeed, Querry allegedly asked petitioner why LaShonda "'was the only one complaining.'" *Id.*, ¶ 12.

Nor, according to the complaint, was any effort made to separate G. F. and LaShonda. *Id.*, ¶ 16. On the contrary, notwithstanding LaShonda's frequent complaints, only after more than three months of reported harassment was she even permitted to change her classroom seat so that she was no longer seated next to G. F. *Id.*, ¶ 13. Moreover, petitioner alleges that, at the time of the events in question, the Monroe County Board of Education (Board) had not instructed its personnel on how to respond to peer sexual harassment and had not established a policy on the issue. *Id.*, ¶ 17.

B

On May 4, 1994, petitioner filed suit in the United States District Court for the Middle District of Georgia against the Board, Charles Dumas, the school district's superintendent, and Principal Querry. The complaint alleged that the Board

is a recipient of federal funding for purposes of Title IX, that "[t]he persistent sexual advances and harassment by the student G. F. upon [LaShonda] interfered with her ability to attend school and perform her studies and activities," and that "[t]he deliberate indifference by Defendants to the unwelcome sexual advances of a student upon LaShonda created an intimidating, hostile, offensive and abus[ive] school environment in violation of Title IX." *Id.*, ¶¶ 27, 28. The complaint sought compensatory and punitive damages, attorney's fees, and injunctive relief. *Id.*, ¶ 32.

The defendants (all respondents here) moved to dismiss petitioner's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted, and the District Court granted respondents' motion. See 862 F. Supp. 363, 368 (MD Ga. 1994). With regard to petitioner's claims under Title IX, the court dismissed the claims against individual defendants on the ground that only federally funded educational institutions are subject to liability in private causes of action under Title IX. *Id.*, at 367. As for the Board, the court concluded that Title IX provided no basis for liability absent an allegation "that the Board or an employee of the Board had any role in the harassment." *Ibid.*

Petitioner appealed the District Court's decision dismissing her Title IX claim against the Board, and a panel of the Court of Appeals for the Eleventh Circuit reversed. 74 F. 3d 1186, 1195 (1996). Borrowing from Title VII law, a majority of the panel determined that student-on-student harassment stated a cause of action against the Board under Title IX: "[W]e conclude that as Title VII encompasses a claim for damages due to a sexually hostile working environment created by co-workers and tolerated by the employer, Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment." *Id.*, at 1193. The

Eleventh Circuit panel recognized that petitioner sought to state a claim based on school "officials' failure to take action to stop the offensive acts of those over whom the officials exercised control," *ibid.*, and the court concluded that petitioner had alleged facts sufficient to support a claim for hostile environment sexual harassment on this theory, *id.*, at 1195.

The Eleventh Circuit granted the Board's motion for rehearing en banc, 91 F. 3d 1418 (1996), and affirmed the District Court's decision to dismiss petitioner's Title IX claim against the Board, 120 F. 3d 1390 (1998). The en banc court relied, primarily, on the theory that Title IX was passed pursuant to Congress' legislative authority under the Constitution's Spending Clause, U. S. Const., Art. I, § 8, cl. 1, and that the statute therefore must provide potential recipients of federal education funding with "unambiguous notice of the conditions they are assuming when they accept" it. 120 F. 3d, at 1399. Title IX, the court reasoned, provides recipients with notice that they must stop their employees from engaging in discriminatory conduct, but the statute fails to provide a recipient with sufficient notice of a duty to prevent student-on-student harassment. *Id.*, at 1401.

Writing in dissent, four judges urged that the statute, by declining to identify the perpetrator of discrimination, encompasses misconduct by third parties: "The identity of the perpetrator is simply irrelevant under the language" of the statute. *Id.*, at 1412 (Barkett, J., dissenting). The plain language, the dissenters reasoned, also provides recipients with sufficient notice that a failure to respond to student-on-student harassment could trigger liability for the district. *Id.*, at 1414.

We granted certiorari, 524 U. S. 980 (1998), in order to resolve a conflict in the Circuits over whether, and under what circumstances, a recipient of federal educational funds can be liable in a private damages action arising from student-on-student sexual harassment, compare 120 F. 3d 1390 (CA11

1998) (case below), and *Rowinsky* v. *Bryan Independent School Dist.*, 80 F. 3d 1006, 1008 (CA5) (holding that private damages action for student-on-student harassment is available under Title IX only where funding recipient responds to these claims differently based on gender of victim), cert. denied, 519 U. S. 861 (1996), with *Doe* v. *University of Illinois*, 138 F. 3d 653, 668 (CA7 1998) (upholding private damages action under Title IX for funding recipient's inadequate response to known student-on-student harassment), vacated and remanded, *post*, p. 1142, *Brzonkala* v. *Virginia Polytechnic Institute and State University*, 132 F. 3d 949, 960–961 (CA4 1997) (same), vacated and District Court decision affirmed en banc, 169 F. 3d 820 (CA4 1999) (not addressing merits of Title IX hostile environment sexual harassment claim and directing District Court to hold this claim in abeyance pending this Court's decision in the instant case), and *Oona, R.-S.-* v. *McCaffrey*, 143 F. 3d 473, 478 (CA9 1998) (rejecting qualified immunity claim and concluding that Title IX duty to respond to student-on-student harassment was clearly established by 1992–1993), cert. denied, *post*, p. 1154. We now reverse.

II

Title IX provides, with certain exceptions not at issue here, that

> "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a).

Congress authorized an administrative enforcement scheme for Title IX. Federal departments or agencies with the authority to provide financial assistance are entrusted to promulgate rules, regulations, and orders to enforce the objectives of § 1681, see § 1682, and these departments or agencies may rely on "any . . . means authorized by law," including

the termination of funding, *ibid.*, to give effect to the statute's restrictions.

There is no dispute here that the Board is a recipient of federal education funding for Title IX purposes. 74 F. 3d, at 1189. Nor do respondents support an argument that student-on-student harassment cannot rise to the level of "discrimination" for purposes of Title IX. Rather, at issue here is the question whether a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment.

A

Petitioner urges that Title IX's plain language compels the conclusion that the statute is intended to bar recipients of federal funding from permitting this form of discrimination in their programs or activities. She emphasizes that the statute prohibits a student from being *"subjected to discrimination* under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a) (emphasis added). It is Title IX's "unmistakable focus on the benefited class," *Cannon* v. *University of Chicago*, 441 U. S. 677, 691 (1979), rather than the perpetrator, that, in petitioner's view, compels the conclusion that the statute works to protect students from the discriminatory misconduct of their peers.

Here, however, we are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages. See *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 283 (1998) ("In this case, . . . petitioners seek not just to establish a Title IX violation but to recover *damages* . . ."). This Court has indeed recognized an implied private right of action under Title IX, see *Cannon* v. *University of Chicago, supra,* and we have held that money damages are available in such suits, *Franklin* v.

*Gwinnett County Public Schools*, 503 U. S. 60 (1992). Because we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause, however, see, *e. g., Gebser* v. *Lago Vista Independent School Dist., supra*, at 287 (Title IX); *Franklin* v. *Gwinnett County Public Schools, supra*, at 74–75, and n. 8 (Title IX); see also *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582, 598–599 (1983) (opinion of White, J.) (Title VI), private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue. When Congress acts pursuant to its spending power, it generates legislation "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). In interpreting language in spending legislation, we thus "insis[t] that Congress speak with a clear voice," recognizing that "[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it." *Ibid.;* see also *id.*, at 24–25.

Invoking *Pennhurst*, respondents urge that Title IX provides no notice that recipients of federal educational funds could be liable in damages for harm arising from student-on-student harassment. Respondents contend, specifically, that the statute only proscribes misconduct by grant recipients, not third parties. Respondents argue, moreover, that it would be contrary to the very purpose of Spending Clause legislation to impose liability on a funding recipient for the misconduct of third parties, over whom recipients exercise little control. See also *Rowinsky* v. *Bryan Independent School Dist.*, 80 F. 3d, at 1013.

We agree with respondents that a recipient of federal funds may be liable in damages under Title IX only for its own misconduct. The recipient itself must "exclud[e] [per-

sons] from participation in, . . . den[y] [persons] the benefits of, or . . . subjec[t] [persons] to discrimination under" its "program[s] or activit[ies]" in order to be liable under Title IX. The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and we have not extended damages liability under Title IX to parties outside the scope of this power. See *National Collegiate Athletic Assn.* v. *Smith,* 525 U. S. 459, 467, n. 5 (1999) (rejecting suggestion "that the private right of action available under . . . § 1681(a) is potentially broader than the Government's enforcement authority"); cf. *Gebser* v. *Lago Vista Independent School Dist., supra,* at 289 ("It would be unsound, we think, for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice").

We disagree with respondents' assertion, however, that petitioner seeks to hold the Board liable for *G. F.*'s actions instead of its own. Here, petitioner attempts to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools. In *Gebser,* we concluded that a recipient of federal education funds may be liable in damages under Title IX where it is deliberately indifferent to known acts of sexual harassment by a teacher. In that case, a teacher had entered into a sexual relationship with an eighth-grade student, and the student sought damages under Title IX for the teacher's misconduct. We recognized that the scope of liability in private damages actions under Title IX is circumscribed by *Pennhurst*'s requirement that funding recipients have notice of their potential liability. 524 U. S., at 287–288. Invoking *Pennhurst, Guardians Assn.,* and *Franklin,* in *Gebser* we once again required "that 'the receiving entity of federal funds [have] notice that it will be liable for a mone-

tary award'" before subjecting it to damages liability. 524 U. S., at 287 (quoting *Franklin* v. *Gwinnett County Public Schools,* 503 U. S., at 74). We also recognized, however, that this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute. *Id.,* at 74–75; see also *Guardians Assn.* v. *Civil Serv. Comm'n of New York City, supra,* at 597–598 (opinion of White, J.) (same with respect to Title VI). In particular, we concluded that *Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute.

Accordingly, we rejected the use of agency principles to impute liability to the district for the misconduct of its teachers. 524 U. S., at 283. Likewise, we declined the invitation to impose liability under what amounted to a negligence standard—holding the district liable for its failure to react to teacher-student harassment of which it knew or *should have* known. *Ibid.* Rather, we concluded that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge. *Id.,* at 290. Contrary to the dissent's suggestion, the misconduct of the teacher in *Gebser* was not "treated as the grant recipient's actions." *Post,* at 661 (opinion of KENNEDY, J.). Liability arose, rather, from "an official decision by the recipient not to remedy the violation." *Gebser* v. *Lago Vista Independent School Dist., supra,* at 290. By employing the "deliberate indifference" theory already used to establish municipal liability under Rev. Stat. § 1979, 42 U. S. C. § 1983, see *Gebser* v. *Lago Vista Independent School Dist., supra,* at 290–291 (citing *Board of Comm'rs of Bryan Cty.* v. *Brown,* 520 U. S. 397 (1997), and *Canton* v. *Harris,* 489 U. S. 378 (1989)), we concluded in *Gebser* that recipients could be liable in damages only where their own deliberate indifference effectively

"cause[d]" the discrimination, 524 U. S., at 291; see also *Canton* v. *Harris, supra,* at 385 (recognizing that a municipality will be liable under § 1983 only if "the municipality *itself* causes the constitutional violation at issue" (emphasis in original)). The high standard imposed in *Gebser* sought to eliminate any "risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." 524 U. S., at 290–291.

*Gebser* thus established that a recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination. Indeed, whether viewed as "discrimination" or "subject[ing]" students to discrimination, Title IX "[u]nquestionably . . . placed on [the Board] the duty not" to permit teacher-student harassment in its schools, *Franklin* v. *Gwinnett County Public Schools, supra,* at 75, and recipients violate Title IX's plain terms when they remain deliberately indifferent to this form of misconduct.

We consider here whether the misconduct identified in *Gebser*—deliberate indifference to known acts of harassment—amounts to an intentional violation of Title IX, capable of supporting a private damages action, when the harasser is a student rather than a teacher. We conclude that, in certain limited circumstances, it does. As an initial matter, in *Gebser* we expressly rejected the use of agency principles in the Title IX context, noting the textual differences between Title IX and Title VII. 524 U. S., at 283; cf. *Faragher* v. *Boca Raton,* 524 U. S. 775, 791–792 (1998) (invoking agency principles on ground that definition of "employer" in Title VII includes agents of employer); *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 72 (1986) (same). Additionally, the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents. The Department of Education re-

quires recipients to monitor third parties for discrimination in specified circumstances and to refrain from particular forms of interaction with outside entities that are known to discriminate. See, e. g., 34 CFR §§ 106.31(b)(6), 106.31(d), 106.37(a)(2), 106.38(a), 106.51(a)(3) (1998).

The common law, too, has put schools on notice that they may be held responsible under state law for their failure to protect students from the tortious acts of third parties. See Restatement (Second) of Torts § 320, and Comment a (1965). In fact, state courts routinely uphold claims alleging that schools have been negligent in failing to protect their students from the torts of their peers. See, e. g., Rupp v. Bryant, 417 So. 2d 658, 666–667 (Fla. 1982); Brahatcek v. Millard School Dist., 202 Neb. 86, 99–100, 273 N. W. 2d 680, 688 (1979); McLeod v. Grant County School Dist. No. 128, 42 Wash. 2d 316, 320, 255 P. 2d 360, 362–363 (1953).

This is not to say that the identity of the harasser is irrelevant. On the contrary, both the "deliberate indifference" standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients. Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.

The language of Title IX itself—particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages— also cabins the range of misconduct that the statute proscribes. The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harass-

ment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. Random House Dictionary of the English Language 1415 (1966) (defining "subject" as "to cause to undergo the action of something specified; expose" or "to make liable or vulnerable; lay open; expose"); Webster's Third New International Dictionary 2275 (1961) (defining "subject" as "to cause to undergo or submit to: make submit to a particular action or effect: EXPOSE"). Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U. S. C. § 1681(a); § 1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control, Webster's Third New International Dictionary, *supra*, at 2487 (defining "under" as "in or into a condition of subjection, regulation, or subordination"; "subject to the guidance and instruction of"); Random House Dictionary, *supra*, at 1543 (defining "under" as "subject to the authority, direction, or supervision of").

These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs. We agree with the dissent that these conditions are satisfied most easily and most obviously when the offender is an agent of the recipient. *Post*, at 661. We rejected the use of agency analysis in *Gebser*, however, and we disagree that the term "under" somehow imports an agency requirement into Title IX. See *post*, at 660–661. As noted above, the theory in *Gebser* was that the recipient was *directly* liable for its deliberate indifference to discrimination. See *supra*, at 642–643. Liability in that case did not arise because the "teacher's actions [were] treated" as those of the funding recipient, *post*, at 661; the district was directly liable for its

*own* failure to act. The terms "subjec[t]" and "under" impose limits, but nothing about these terms requires the use of agency principles.

Where, as here, the misconduct occurs during school hours and on school grounds—the bulk of G. F.'s misconduct, in fact, took place in the classroom—the misconduct is taking place "under" an "operation" of the funding recipient. See *Doe* v. *University of Illinois*, 138 F. 3d, at 661 (finding liability where school fails to respond properly to "student-on-student sexual harassment that takes place while the students are involved in school activities or otherwise under the supervision of school employees"). In these circumstances, the recipient retains substantial control over the context in which the harassment occurs. More importantly, however, in this setting the Board exercises significant control over the harasser. We have observed, for example, "that the nature of [the State's] power [over public schoolchildren] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655 (1995). On more than one occasion, this Court has recognized the importance of school officials' "comprehensive authority . . . , consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 507 (1969); see also *New Jersey* v. *T. L. O.*, 469 U. S. 325, 342, n. 9 (1985) ("The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities"); 74 F. 3d, at 1193 ("The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace . . ."). The common law, too, recognizes the school's disciplinary authority. See Restatement (Second) of Torts § 152 (1965). We thus conclude that recipients of federal funding may be liable for "subject[ing]" their students

to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.

At the time of the events in question here, in fact, school attorneys and administrators were being told that student-on-student harassment could trigger liability under Title IX. In March 1993, even as the events alleged in petitioner's complaint were unfolding, the National School Boards Association issued a publication, for use by "school attorneys and administrators in understanding the law regarding sexual harassment of employees and students," which observed that districts could be liable under Title IX for their failure to respond to student-on-student harassment. See National School Boards Association Council of School Attorneys, Sexual Harassment in the Schools: Preventing and Defending Against Claims v, 45 (rev. ed.). Drawing on Equal Employment Opportunity Commission guidelines interpreting Title VII, the publication informed districts that, "if [a] school district has constructive notice of severe and repeated acts of sexual harassment by fellow students, that may form the basis of a [T]itle IX claim." *Ibid.* The publication even correctly anticipated a form of *Gebser*'s actual notice requirement: "It is unlikely that courts will hold a school district liable for sexual harassment by students against students in the absence of actual knowledge or notice to district employees." Sexual Harassment in the Schools, *supra*, at 45. Although we do not rely on this publication as an "indicium of congressional notice," see *post*, at 671, we do find support for our reading of Title IX in the fact that school attorneys have rendered an analogous interpretation.

Likewise, although they were promulgated too late to contribute to the Board's notice of proscribed misconduct, the Department of Education's Office for Civil Rights (OCR) has recently adopted policy guidelines providing that student-on-student harassment falls within the scope of Title IX's proscriptions. See Department of Education, Office of Civil

Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12039–12040 (1997) (OCR Title IX Guidelines); see also Department of Education, Racial Incidents and Harassment Against Students at Educational Institutions, 59 Fed. Reg. 11448, 11449 (1994).

We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. We thus disagree with respondents' contention that, if Title IX provides a cause of action for student-on-student harassment, "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." See Brief for Respondents 16; see also 120 F. 3d, at 1402 (Tjoflat, J.) ("[A] school must immediately suspend or expel a student accused of sexual harassment"). Likewise, the dissent erroneously imagines that victims of peer harassment now have a Title IX right to make particular remedial demands. See post, at 686 (contemplating that victim could demand new desk assignment). In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators. New Jersey v. T. L. O., supra, at 342–343, n. 9.

School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. The dissent consistently mischaracterizes this standard to require funding recipients to "remedy" peer harassment, post, at 658, 662, 668, 683, and to "ensur[e] that . . . students conform their conduct to" certain rules, post, at 666. Title IX imposes no such requirements. On the contrary,

the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere "reasonableness" standard, as the dissent assumes. See *post*, at 679. In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.

Like the dissent, see *post*, at 664–668, we acknowledge that school administrators shoulder substantial burdens as a result of legal constraints on their disciplinary authority. To the extent that these restrictions arise from federal statutes, Congress can review these burdens with attention to the difficult position in which such legislation may place our Nation's schools. We believe, however, that the standard set out here is sufficiently flexible to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action. A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy, see *post*, at 666–668, and it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.

While it remains to be seen whether petitioner can show that the Board's response to reports of G. F.'s misconduct was clearly unreasonable in light of the known circumstances, petitioner may be able to show that the Board "subject[ed]" LaShonda to discrimination by failing to respond in any way over a period of five months to complaints of G. F.'s in-school misconduct from LaShonda and other female students.

B

The requirement that recipients receive adequate notice of Title IX's proscriptions also bears on the proper definition of "discrimination" in the context of a private damages action. We have elsewhere concluded that sexual harassment is a

form of discrimination for Title IX purposes and that Title IX proscribes harassment with sufficient clarity to satisfy *Pennhurst*'s notice requirement and serve as a basis for a damages action. See *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S., at 281; *Franklin* v. *Gwinnett County Public Schools*, 503 U. S., at 74–75. Having previously determined that "sexual harassment" is "discrimination" in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute. See *Bennett* v. *Kentucky Dept. of Ed.*, 470 U. S. 656, 665–666 (1985) (rejecting claim of insufficient notice under *Pennhurst* where statute made clear that there were some conditions placed on receipt of federal funds, and noting that Congress need not "specifically identif[y] and proscrib[e]" each condition in the legislation). The statute's other prohibitions, moreover, help give content to the term "discrimination" in this context. Students are not only protected from discrimination, but also specifically shielded from being "excluded from participation in" or "denied the benefits of" any "education program or activity receiving Federal financial assistance." § 1681(a). The statute makes clear that, whatever else it prohibits, students must not be denied access to educational benefits and opportunities on the basis of gender. We thus conclude that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

The most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources. Consider, for example, a case in which male students physically threaten their female peers every

day, successfully preventing the female students from using a particular school resource—an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages. It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex. Rather, a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities. Cf. *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S., at 67.

Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75, 82 (1998), including, but not limited to, the ages of the harasser and the victim and the number of individuals involved, see OCR Title IX Guidelines 12041–12042. Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. See, *e. g.,* Brief for National School Boards Association et al. as *Amici Curiae* 11 (describing "dizzying array of immature . . . behaviors by students"). Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students

subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

The dissent fails to appreciate these very real limitations on a funding recipient's liability under Title IX. It is not enough to show, as the dissent would read this opinion to provide, that a student has been "teased," *post*, at 678, or "called . . . offensive names," *post*, at 680. Comparisons to an "overweight child who skips gym class because the other children tease her about her size," the student who "refuses to wear glasses to avoid the taunts of 'four-eyes,'" and "the child who refuses to go to school because the school bully calls him a 'scaredy-cat' at recess," *post*, at 678, are inapposite and misleading. Nor do we contemplate, much less hold, that a mere "decline in grades is enough to survive" a motion to dismiss. *Post*, at 677. The dropoff in LaShonda's grades provides necessary evidence of a potential link between her education and G. F.'s misconduct, but petitioner's ability to state a cognizable claim here depends equally on the alleged persistence and severity of G. F.'s actions, not to mention the Board's alleged knowledge and deliberate indifference. We trust that the dissent's characterization of our opinion will not mislead courts to impose more sweeping liability than we read Title IX to require.

Moreover, the provision that the discrimination occur "under any education program or activity" suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would

have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment. By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored. Even the dissent suggests that Title IX liability may arise when a funding recipient remains indifferent to severe, gender-based mistreatment played out on a "widespread level" among students. *Post,* at 683.

The fact that it was a teacher who engaged in harassment in *Franklin* and *Gebser* is relevant. The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment.

## C

Applying this standard to the facts at issue here, we conclude that the Eleventh Circuit erred in dismissing petitioner's complaint. Petitioner alleges that her daughter was the victim of repeated acts of sexual harassment by G. F. over a 5-month period, and there are allegations in support of the conclusion that G. F.'s misconduct was severe, pervasive, and objectively offensive. The harassment was not only verbal; it included numerous acts of objectively offensive touching, and, indeed, G. F. ultimately pleaded guilty to criminal sexual misconduct. Moreover, the complaint alleges that there were multiple victims who were sufficiently disturbed by G. F.'s misconduct to seek an audience with the school prin-

cipal. Further, petitioner contends that the harassment had a concrete, negative effect on her daughter's ability to receive an education. The complaint also suggests that petitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment.

On this complaint, we cannot say "beyond doubt that [petitioner] can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957). See also *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). Accordingly, the judgment of the United States Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

The Court has held that Congress' power "'to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.'" *South Dakota* v. *Dole*, 483 U. S. 203, 207 (1987) (quoting *United States* v. *Butler*, 297 U. S. 1, 66 (1936)). As a consequence, Congress can use its Spending Clause power to pursue objectives outside of "Article I's 'enumerated legislative fields'" by attaching conditions to the grant of federal funds. 483 U. S., at 207. So understood, the Spending Clause power, if wielded without concern for the federal balance, has the potential to obliterate distinctions between national and local spheres of interest and power by permitting the Federal Government to set pol-

icy in the most sensitive areas of traditional state concern, areas which otherwise would lie outside its reach.

A vital safeguard for the federal balance is the requirement that, when Congress imposes a condition on the States' receipt of federal funds, it "must do so unambiguously." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). As the majority acknowledges, "legislation enacted pursuant to the spending power is much in the nature of a contract," and the legitimacy of Congress' exercise of its power to condition funding on state compliance with congressional conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Ibid.;* see *ante*, at 640. "'There can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.'" *Ibid.* (quoting *Pennhurst*, 451 U. S., at 17).

Our insistence that "Congress speak with a clear voice" to "enable the States to exercise their choice knowingly, cognizant of the consequences of their participation," *ibid.*, is not based upon some abstract notion of contractual fairness. Rather, it is a concrete safeguard in the federal system. Only if States receive clear notice of the conditions attached to federal funds can they guard against excessive federal intrusion into state affairs and be vigilant in policing the boundaries of federal power. Cf. *Dole, supra*, at 217 (O'CONNOR, J., dissenting) ("If the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives 'power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed'" (quoting *Butler, supra*, at 78)). While the majority purports to give effect to these principles, it eviscerates the clear-notice safeguard of our Spending Clause jurisprudence.

Title IX provides:

> "No person in the United States shall, on the basis of
> sex, be [1] excluded from participation in, [2] be denied
> the benefits of, or [3] be subjected to discrimination
> under any education program or activity receiving Fed-
> eral financial assistance."  20 U. S. C. § 1681(a).

To read the provision in full is to understand what is most
striking about its application in this case: Title IX does not
by its terms create any private cause of action whatsoever,
much less define the circumstances in which money damages
are available.  The only private cause of action under Title
IX is judicially implied.  See *Cannon* v. *University of Chi-
cago*, 441 U. S. 677 (1979).

The Court has encountered great difficulty in establishing
standards for deciding when to imply a private cause of ac-
tion under a federal statute which is silent on the subject.
We try to conform the judicial judgment to the bounds of
likely congressional purpose but, as we observed in *Gebser*
v. *Lago Vista Independent School Dist.*, 524 U. S. 274 (1998),
defining the scope of the private cause of action in general,
and the damages remedy in particular, "inherently entails a
degree of speculation, since it addresses an issue on which
Congress has not specifically spoken."  *Id.*, at 284.

When the statute at issue is a Spending Clause statute,
this element of speculation is particularly troubling because
it is in significant tension with the requirement that Spend-
ing Clause legislation give States clear notice of the con-
sequences of their acceptance of federal funds.  Without
doubt, the scope of potential damages liability is one of the
most significant factors a school would consider in deciding
whether to receive federal funds.  Accordingly, the Court
must not imply a private cause of action for damages unless
it can demonstrate that the congressional purpose to create
the implied cause of action is so manifest that the State,

when accepting federal funds, had clear notice of the terms and conditions of its monetary liability.

Today the Court fails to heed, or even to acknowledge, these limitations on its authority. The remedial scheme the majority creates today is neither sensible nor faithful to Spending Clause principles. In order to make its case for school liability for peer sexual harassment, the majority must establish that Congress gave grant recipients clear and unambiguous notice that they would be liable in money damages for failure to remedy discriminatory acts of their students. The majority must also demonstrate that the statute gives schools clear notice that one child's harassment of another constitutes "discrimination" on the basis of sex within the meaning of Title IX, and that—as applied to individual cases—the standard for liability will enable the grant recipient to distinguish inappropriate childish behavior from actionable gender discrimination. The majority does not carry these burdens.

Instead, the majority finds statutory clarity where there is none and discovers indicia of congressional notice to the States in the most unusual of places. It treats the issue as one of routine statutory construction alone, and it errs even in this regard. In the end, the majority not only imposes on States liability that was unexpected and unknown, but the contours of which are, as yet, unknowable. The majority's opinion purports to be narrow, but the limiting principles it proposes are illusory. The fence the Court has built is made of little sticks, and it cannot contain the avalanche of liability now set in motion. The potential costs to our schools of today's decision are difficult to estimate, but they are so great that it is most unlikely Congress intended to inflict them.

The only certainty flowing from the majority's decision is that scarce resources will be diverted from educating our children and that many school districts, desperate to avoid Title IX peer harassment suits, will adopt whatever federal code of student conduct and discipline the Department of Ed-

ucation sees fit to impose upon them. The Nation's school-children will learn their first lessons about federalism in classrooms where the Federal Government is the ever-present regulator. The Federal Government will have insinuated itself not only into one of the most traditional areas of state concern but also into one of the most sensitive areas of human affairs. This federal control of the discipline of our Nation's schoolchildren is contrary to our traditions and inconsistent with the sensible administration of our schools. Because Title IX did not give States unambiguous notice that accepting federal funds meant ceding to the Federal Government power over the day-to-day disciplinary decisions of schools, I dissent.

## I

I turn to the first difficulty with the majority's decision. Schools cannot be held liable for peer sexual harassment because Title IX does not give them clear and unambiguous notice that they are liable in damages for failure to remedy discrimination by their students. As the majority acknowledges, Title IX prohibits only misconduct by grant recipients, not misconduct by third parties. *Ante*, at 640–641 ("The recipient itself must 'exclud[e] [persons] from participation in, ... den[y] [persons] the benefits of, or ... subjec[t] [persons] to discrimination under' its 'program[s] or activit[ies]' in order to be liable under Title IX"). The majority argues, nevertheless, that a school "subjects" its students to discrimination when it knows of peer harassment and fails to respond appropriately.

The mere word "subjected" cannot bear the weight of the majority's argument. As we recognized in *Gebser*, the primary purpose of Title IX is "to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." 524 U. S., at 292. We stressed in *Gebser* that Title IX prevents discrimination by the grant recipient, whether through the acts of its principals or the acts of its agents. See *id.*, at 286 (explaining that Title IX and Title VI

"operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds"). "[W]hereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." *Id.*, at 287. The majority does not even attempt to argue that the school's failure to respond to discriminatory acts by students is discrimination by the school itself.

## A

In any event, a plaintiff cannot establish a Title IX violation merely by showing that she has been "subjected to discrimination." Rather, a violation of Title IX occurs only if she is "subjected to discrimination under any education program or activity," 20 U. S. C. § 1681(a), where "program or activity" is defined as "all of the operations of" a grant recipient, § 1687.

Under the most natural reading of this provision, discrimination violates Title IX only if it is authorized by, or in accordance with, the actions, activities, or policies of the grant recipient. See Webster's Third New International Dictionary 2487 (1981) (defining "under" as "required by: in accordance with: bound by"); American Heritage Dictionary 1395 (New College ed. 1981) (defining "under" as "[w]ith the authorization of; attested by; by virtue of"); Random House Dictionary of the English Language 2059 (2d ed. 1987) (defining "under" as "authorized, warranted, or attested by" or "in accordance with"); see also 43 Words and Phrases 149–152 (1969) (citing cases defining "under" as, *inter alia*, " 'in accordance with' and 'in conformity with' "; "indicating subjection, guidance or control, and meaning 'by authority of' "; " 'by,' 'by reason of,' or 'by means of' "; and " 'by virtue of,' which is defined . . . as meaning 'by or through the authority of' "). This reading reflects the common legal usage of the

term "under" to mean pursuant to, in accordance with, or as authorized or provided by. See, e. g., *Gregory* v. *Ashcroft*, 501 U. S. 452, 469 (1991) ("Because Congress nowhere stated its intent to impose mandatory obligations on the States under its § 5 powers, we concluded that Congress did not do so"); *ante*, at 632 ("Among petitioner's claims was a claim for monetary and injunctive relief under Title IX . . .").

It is not enough, then, that the alleged discrimination occur in a "context subject to the school district's control." *Ante*, at 645. The discrimination must actually be "controlled by"—that is, be authorized by, pursuant to, or in accordance with, school policy or actions. Compare *ante*, at 645 (defining "under" as "*in* or into *a condition of* subjection, regulation, or subordination" (emphasis added)), with *ibid.* (defining "under" as "*subject to* the guidance and instruction of" (emphasis added)).

This reading is also consistent with the fact that the discrimination must be "under" the "operations" of the grant recipient. The term "operations" connotes active and affirmative participation by the grant recipient, not merely inaction or failure to respond. See Black's Law Dictionary 1092 (6th ed. 1990) (defining "operation" as an "[e]xertion of power; the process of operating or mode of action; an effect brought about in accordance with a definite plan; action; activity").

Teacher sexual harassment of students is "under" the school's program or activity in certain circumstances, but student harassment is not. Our decision in *Gebser* recognizes that a grant recipient acts through its agents and thus, under certain limited circumstances, even tortious acts by teachers may be attributable to the school.ʳ We noted in *Gebser* that, in contrast to Title VII, which defines "employer" to include "any agent"—Title IX "contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles." 524 U. S., at 283. As a result, we declined to incor-

porate principles of agency liability, such as a strict application of vicarious liability, that would conflict with the Spending Clause's notice requirement and Title IX's express administrative enforcement scheme.

Contrary to the majority's assertion, *ante*, at 643, however, we did not abandon agency principles altogether. Rather, we sought in *Gebser* to identify those employee actions which could fairly be attributed to the grant recipient by superimposing additional Spending Clause notice requirements on traditional agency principles. 524 U. S., at 288 ("Title IX contains important clues that Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice"). We concluded that, because of the Spending Clause overlay, a teacher's discrimination is attributable to the school only when the school has actual notice of that harassment and is "deliberately indifferent." The agency relation between the school and the teacher is thus a necessary, but not sufficient, condition of school liability. Where the heightened requirements for attribution are met, the teacher's actions are treated as the grant recipient's actions. In those circumstances, then, the teacher sexual harassment is "under" the operations of the school.

I am aware of no basis in law or fact, however, for attributing the acts of a student to a school and, indeed, the majority does not argue that the school acts through its students. See *ante*, at 641 ("We disagree with respondents' assertion . . . that petitioner seeks to hold the Board liable for *G. F.*'s actions instead of its own. Here, petitioner attempts to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools"). Discrimination by one student against another therefore cannot be "under" the school's program or activity as required by Title IX. The majority's imposition of liability for peer sexual harassment thus conflicts with the most natural interpretation of Title IX's "under a program

or activity" limitation on school liability. At the very least, my reading undermines the majority's implicit claim that Title IX imposes an unambiguous duty on schools to remedy peer sexual harassment.

B

1

Quite aside from its disregard for the "under the program" limitation of Title IX, the majority's reading is flawed in other respects. The majority contends that a school's deliberate indifference to known student harassment "subjects" students to harassment—that is, "cause[s] [students] to undergo" harassment. *Ante,* at 645. The majority recognizes, however, that there must be some limitation on the third-party conduct that the school can fairly be said to cause. In search of a principle, the majority asserts, without much elaboration, that one causes discrimination when one has some "degree of control" over the discrimination and fails to remedy it. *Ante,* at 644.

To state the majority's test is to understand that it is little more than an exercise in arbitrary line-drawing. The majority does not explain how we are to determine what degree of control is sufficient—or, more to the point, how the States were on clear notice that the Court would draw the line to encompass students.

Agency principles usually mark the outer limits of an entity's liability for the actions of an individual over whom it exercises some control. Cf. *Faragher* v. *Boca Raton,* 524 U. S. 775 (1998) (applying agency principles to delimit Title VII employer liability); *Burlington Industries, Inc.* v. *Ellerth,* 524 U. S. 742 (1998) (same). The Court, for example, has not recognized liability for the actions of nonagents under Title VII, which contains an express private right of action and is not Spending Clause legislation. The majority nonetheless rejects out-of-hand an agency limitation on Title IX liability based on its cramped reading of *Gebser.* As

noted above, the *Gebser* Court rejected the wholesale importation of federal common-law agency principles into Title IX to expand liability beyond that which the statute clearly prohibited; it did not, as the majority would have it, reject the proposition that school liability is limited by agency principles. Indeed, to suppose that Congress would have rejected well-established principles of agency law in favor of the majority's vague control principle turns *Gebser* on its head. *Gebser* contemplated that Title IX liability would be less expansive than Title VII liability, not more so. See *Gebser, supra,* at 286–287.

One would think that the majority would at least limit its control principle by reference to the long-established practice of the Department of Education (DOE). For the first 25 years after the passage of Title IX—until 1997—the DOE's regulations drew the liability line, at its most expansive, to encompass only those to whom the school delegated its official functions. See 34 CFR § 106.51(a)(3) (1998) ("A [grant] recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination prohibited by this subpart, including relationships with employment and referral agencies, with labor unions, and with organizations providing or administering fringe benefits to employees of the recipient"). It is perhaps reasonable to suppose that grant recipients were on notice that they could not hire third parties to do for them what they could not do themselves. For example, it might be reasonable to find that a school was on notice that it could not circumvent Title IX's core prohibitions by, for example, delegating its admissions decisions to an outside screening committee it knew would discriminate on the basis of gender.

Given the state of gender discrimination law at the time Title IX was passed, however, there is no basis to think that Congress contemplated liability for a school's failure to remedy discriminatory acts by students or that the States would

believe the statute imposed on them a clear obligation to do so. When Title IX was enacted in 1972, the concept of "sexual harassment" as gender discrimination had not been recognized or considered by the courts. See generally C. MacKinnon, Sexual Harassment of Working Women: A Case of Sex Discrimination 59–72 (1979). The types of discrimination that were recognized—discriminatory admissions standards, denial of access to programs or resources, hiring, etc.—could not be engaged in by students. See, e. g., 20 U. S. C. § 1681(a)(2) (referencing application of Title IX prohibitions to school admissions).

2

The majority nonetheless appears to see no need to justify drawing the "enough control" line to encompass students. In truth, however, a school's control over its students is much more complicated and limited than the majority acknowledges. A public school does not control its students in the way it controls its teachers or those with whom it contracts. Most public schools do not screen or select students, and their power to discipline students is far from unfettered.

Public schools are generally obligated by law to educate all students who live within defined geographic boundaries. Indeed, the Constitution of almost every State in the country guarantees the State's students a free primary and secondary public education. See, e. g., Cal. Const., Art. IX, § 5; Colo. Const., Art. IX, § 2; Ga. Const., Art. VIII, § 1, ¶ 1; Ind. Const., Art. VIII, § 1; Md. Const., Art. VIII, § 1; Mo. Const., Art. IX, § 1(a); Neb. Const., Art. VII, § 1; N. J. Const., Art. VIII, § 4, ¶ 1; N. M. Const., Art. XII, § 1; N. Y. Const., Art. XI, § 1; N. D. Const., Art. VIII, §§ 1 and 2; Okla. Const., Art. XIII, § 1; S. C. Const., Art. XI, § 3; Tex. Const., Art. VII, § 1; Va. Const., Art. VIII, § 1; Wash. Const., Art. IX, §§ 1 and 2; Wyo. Const., Art. VII, §§ 1 and 9. In at least some States, moreover, there is a continuing duty on schools to educate even students who are suspended or expelled. See, e. g.,

*Phillip Leon M.* v. *Board of Education,* 199 W. Va. 400, 484 S. E. 2d 909 (1996) (holding that the education clause of the West Virginia Constitution confers on students a fundamental right to an education and requires that a county school board provide alternative educational programs, such as an alternative school, to students who are expelled or suspended for an extended period for bringing guns to school). Schools that remove a harasser from the classroom and then attempt to fulfill their continuing-education obligation by placing the harasser in any kind of group setting, rather than by hiring expensive tutors for each student, will find themselves at continuing risk of Title IX suits brought by the other students in the alternative education program.

In addition, federal law imposes constraints on school disciplinary actions. This Court has held, for example, that due process requires, "[a]t the very minimum," that a student facing suspension "be given some kind of notice and afforded some kind of hearing." *Goss* v. *Lopez,* 419 U. S. 565, 579 (1975).

The Individuals with Disabilities Education Act (IDEA), 20 U. S. C. § 1400 *et seq.* (1994 ed., Supp. III), moreover, places strict limits on the ability of schools to take disciplinary actions against students with behavior disorder disabilities, even if the disability was not diagnosed prior to the incident triggering discipline. See, *e. g.,* § 1415(f)(1) (parents entitled to hearing when school proposes to change disabled student's educational placement); § 1415(k)(1)(A) (school authorities can only "order a change in the placement of a child with a disability . . . to an appropriate interim alternative educational setting, another setting, or suspension" for up to "10 school days" unless student's offense involved a weapon or illegal drugs); § 1415(k)(8) ("[A] child who has not been determined to be eligible for special education . . . and who has engaged in behavior that violated any [school rule] may assert any of the protections" of the subchapter if the school "had knowledge . . . that the child was a child with a disabil-

ity before the behavior that precipitated the disciplinary action occurred"); § 1415(k)(8)(B)(ii) (school "deemed to have knowledge that a child is a child with a disability if . . . the behavior or performance of the child demonstrates the need for such [special education and related] services"). "Disability," as defined in the IDEA, includes "serious emotional disturbance," § 1401(3)(A)(i), which the DOE, in turn, has defined as a "condition exhibiting . . . over a long period of time and to a marked degree that adversely affects a child's educational performance," an "inability to build or maintain satisfactory interpersonal relationships with peers and teachers," or "[i]nappropriate types of behavior or feelings under normal circumstances." 34 CFR § 300.7(b)(9) (1998). If, as the majority would have us believe, the behavior that constitutes actionable peer sexual harassment so deviates from the normal teasing and jostling of adolescence that it puts schools on clear notice of potential liability, then a student who engages in such harassment may have at least a colorable claim of severe emotional disturbance within the meaning of the IDEA. When imposing disciplinary sanction on a student harasser who might assert a colorable IDEA claim, the school must navigate a complex web of statutory provisions and DOE regulations that significantly limit its discretion.

The practical obstacles schools encounter in ensuring that thousands of immature students conform their conduct to acceptable norms may be even more significant than the legal obstacles. School districts cannot exercise the same measure of control over thousands of students that they do over a few hundred adult employees. The limited resources of our schools must be conserved for basic educational services. Some schools lack the resources even to deal with serious problems of violence and are already overwhelmed with disciplinary problems of all kinds.

Perhaps even more startling than its broad assumptions about school control over primary and secondary school stu-

dents is the majority's failure to grapple in any meaningful way with the distinction between elementary and secondary schools, on the one hand, and universities on the other. The majority bolsters its argument that schools can control their students' actions by quoting our decision in *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 655 (1995), for the proposition that "'the nature of [the State's] power [over public school children] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.'" *Ante*, at 646. Yet the majority's holding would appear to apply with equal force to universities, which do not exercise custodial and tutelary power over their adult students.

A university's power to discipline its students for speech that may constitute sexual harassment is also circumscribed by the First Amendment. A number of federal courts have already confronted difficult problems raised by university speech codes designed to deal with peer sexual and racial harassment. See, *e. g.*, *Dambrot* v. *Central Mich. Univ.*, 55 F. 3d 1177 (CA6 1995) (striking down university discriminatory harassment policy because it was overbroad, vague, and not a valid prohibition on fighting words); *UWM Post, Inc.* v. *Board of Regents of Univ. of Wis. System*, 774 F. Supp. 1163 (ED Wis. 1991) (striking down university speech code that prohibited, *inter alia*, "'discriminatory comments'" directed at an individual that "'intentionally . . . demean'" the "'sex . . . of the individual'" and "'[c]reate an intimidating, hostile or demeaning environment for education, university related work, or other university-authorized activity'"); *Doe* v. *University of Mich.*, 721 F. Supp. 852 (ED Mich. 1989) (similar); *Iota XI Chapter of Sigma Chi Fraternity* v. *George Mason Univ.*, 993 F. 2d 386 (CA4 1993) (overturning on First Amendment grounds university's sanctions on a fraternity for conducting an "ugly woman contest" with "racist and sexist" overtones).

The difficulties associated with speech codes simply underscore the limited nature of a university's control over student behavior that may be viewed as sexual harassment. Despite the fact that the majority relies on the assumption that schools exercise a great deal of control over their students to justify creating the private cause of action in the first instance, it does not recognize the obvious limits on a university's ability to control its students as a reason to doubt the propriety of a private cause of action for peer harassment. It simply uses them as a factor in determining whether the university's response was reasonable.   See *ante*, at 649.

### 3

The majority's presentation of its control test illustrates its own discomfort with the rule it has devised.   Rather than beginning with the language of Title IX itself, the majority begins with our decision in *Gebser* and appears to discover there a sweeping legal duty—divorced from agency principles—for schools to remedy third-party discrimination against students.   The majority then finds that the DOE's Title IX regulations and state common law gave States the requisite notice that they would be liable in damages for failure to fulfill this duty.   Only then does the majority turn to the language of Title IX itself—not, it appears, to find a duty or clear notice to the States, for that the majority assumes has already been established, but rather to suggest a limit on the breathtaking scope of the liability the majority thinks is so clear under the statute.   See *ante*, at 645 ("These factors [("subjects" and "under")] combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs").

Our decision in *Gebser* did not, of course, recognize some ill-defined, freestanding legal duty on schools to remedy discrimination by third parties.   In particular, *Gebser* gave schools no notice whatsoever that they might be liable on the

majority's novel theory that a school "subjects" a student to third-party discrimination if it exercises some measure of control over the third party. We quoted the "subjected to discrimination" language only once in *Gebser*, when we quoted the text of Title IX in full, and we did not use the word "control." Instead, we affirmed that Title IX prohibits discrimination by the grant recipient. See *Gebser*, 524 U. S., at 286; *id.*, at 291–292; *supra*, at 658–659.

Neither the DOE's Title IX regulations nor state tort law, moreover, could or did provide States the notice required by our Spending Clause principles. The majority contends that the DOE's Title IX regulations have "long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents." *Ante*, at 643. Even assuming that DOE regulations could give schools the requisite notice, they did not do so. Not one of the regulations the majority cites suggests that schools may be held liable in money damages for failure to respond to third-party discrimination.

In addition, as discussed above, the DOE regulations provide no support for the proposition that schools were on notice that students were among those "nonagents" whose actions the schools were bound to remedy. Most of the regulations cited by the majority merely forbid grant recipients to give affirmative aid to third parties who discriminate. See 34 CFR §106.31(b)(6) (1998) (A grant "recipient shall not, on the basis of sex," "[a]id or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees"); see also §106.37(a)(2) (A grant recipient shall not, "[t]hrough solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex"); §106.38(a) (A grant recip-

ient "which assists any agency, organization or person in making employment available to any of its students [s]hall assure itself that such employment is made available without discrimination on the basis of sex [and] [s]hall not render such services to any agency, organization, or person which discriminates on the basis of sex in its employment practices"). The others forbid grant recipients to delegate the provision of student (or employee) benefits and services to third parties who engage in gender discrimination in administering what is, in effect, the school's program. See § 106.51(a)(3) ("A [grant] recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination prohibited by this subpart, including relationships with employment and referral agencies, with labor unions, and with organizations providing or administering fringe benefits to employees of the recipient"); see also § 106.31(d) (A grant recipient "which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational consortia and cooperative employment and student-teaching assignments" must take steps to assure itself that the education program or activity is not discriminating on the basis of gender and "shall not facilitate, require, permit, or consider such participation" if the program is discriminating). None of the regulations suggests a generalized duty to remedy discrimination by third parties over whom the school may arguably exercise some control.

Requiring a school to take affirmative steps to remedy harassment by its students imposes a much heavier burden on schools than prohibiting affirmative aid or effective delegation of school functions to an entity that discriminates. Notice of these latter responsibilities, then, can hardly be said

to encompass clear notice of the former. In addition, each of the DOE regulations is predicated on a grant recipient's choice to give affirmative aid to, or to enter into voluntary association with, a discriminating entity. The recipient, moreover, as the regulations envision, is free to terminate that aid or association (or could have so provided through contract). The relationships regulated by the DOE are thus quite different from school-student relationships. The differences confirm that the regulations did not provide adequate notice of a duty to remedy student discrimination.

The majority also concludes that state tort law provided States the requisite notice. It is a non sequitur to suppose, however, that a State knows it is liable under a federal statute simply because the underlying conduct might form the basis for a state tort action. In any event, it is far from clear that Georgia law gave the Monroe County Board of Education notice that it would be liable even under state law for failure to respond reasonably to known student harassment. See, e. g., Holbrook v. Executive Conference Center, Inc., 219 Ga. App. 104, 106, 464 S. E. 2d 398, 401 (1996) (holding that school districts are entitled to sovereign immunity for claims based on their supervision of students unless the school displayed "wilfulness, malice, or corruption").

The majority's final observation about notice confirms just how far it has strayed from the basic Spending Clause principle that Congress must, through the clear terms of the statute, give States notice as to what the statute requires. The majority contends that schools were on notice because they "were being told" by a 1993 National School Boards Association publication that peer sexual harassment might trigger Title IX liability. Ante, at 647. By treating a publication designed to help school lawyers prevent and guard against school liability as a reliable indicium of congressional notice, the majority has transformed a litigation manual—which, like all such manuals, errs on the side of caution in describing potential liability—into a self-fulfilling prophecy. It seems

schools cannot even discuss potential liabilities amongst themselves without somehow stipulating that Congress had some specified intent.

## II

Our decision in *Gebser* makes clear that the Spending Clause clear-notice rule requires both that the recipients be on general notice of the kind of conduct the statute prohibits, and—at least when money damages are sought—that they be on notice that illegal conduct is occurring in a given situation. See, *e. g., Gebser*, 524 U. S., at 287–288 (rejecting vicarious liability because it would hold schools liable even when they did not know that prohibited discrimination was occurring).

Title IX, however, gives schools neither notice that the conduct the majority labels peer "sexual harassment" is gender discrimination within the meaning of the Act nor any guidance in distinguishing in individual cases between actionable discrimination and the immature behavior of children and adolescents. The majority thus imposes on schools potentially crushing financial liability for student conduct that is not prohibited in clear terms by Title IX and that cannot, even after today's opinion, be identified by either schools or courts with any precision.

The law recognizes that children—particularly young children—are not fully accountable for their actions because they lack the capacity to exercise mature judgment. See, *e. g.,* 1 E. Farnsworth, Contracts § 4.4 (2d ed. 1998) (discussing minor's ability to disaffirm a contract into which he has entered). It should surprise no one, then, that the schools that are the primary locus of most children's social development are rife with inappropriate behavior by children who are just learning to interact with their peers. The *amici* on the front lines of our schools describe the situation best:

"Unlike adults in the workplace, juveniles have limited life experiences or familial influences upon which to es-

tablish an understanding of appropriate behavior. The real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend." Brief for National School Boards Association et al. as *Amici Curiae* 10–11 (hereinafter Brief for School *Amici*).

No one contests that much of this "dizzying array of immature or uncontrollable behaviors by students," *ibid.*, is inappropriate, even "objectively offensive" at times, *ante*, at 650, and that parents and schools have a moral and ethical responsibility to help students learn to interact with their peers in an appropriate manner. It is doubtless the case, moreover, that much of this inappropriate behavior is directed toward members of the opposite sex, as children in the throes of adolescence struggle to express their emerging sexual identities.

It is a far different question, however, whether it is either proper or useful to label this immature, childish behavior gender discrimination. Nothing in Title IX suggests that Congress even contemplated this question, much less answered it in the affirmative in unambiguous terms.

The majority, nevertheless, has no problem labeling the conduct of fifth graders "sexual harassment" and "gender discrimination." Indeed, the majority sidesteps the difficult issue entirely, first by asserting without analysis that respondents do not "support an argument that student-on-student harassment cannot rise to the level of discrimination' for purposes of Title IX," *ante*, at 639, and then by citing *Gebser* and *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60 (1992), for the proposition that "[w]e have elsewhere concluded that sexual harassment is a form of discrimination for Title IX purposes and that Title IX proscribes harassment with sufficient clarity to satisfy *Pennhurst*'s no-

tice requirement and serve as a basis for a damages action," *ante,* at 649–650.

Contrary to the majority's assertion, however, respondents have made a cogent and persuasive argument that the type of student conduct alleged by petitioner should not be considered "sexual harassment," much less gender discrimination actionable under Title IX:

> "[A]t the time Petitioner filed her complaint, no court, including this Court had recognized the concept of sexual harassment in any context other than the employment context. Nor had any Court extended the concept of sexual harassment to the misconduct of emotionally and socially immature children. The type of conduct alleged by Petitioner in her complaint is not new. However, in past years it was properly identified as misconduct which was addressed within the context of student discipline. The Petitioner now asks this Court to create out of whole cloth a cause of action by labeling childish misconduct as 'sexual harassment,' to stigmatize children as sexual harassers, and have the federal court system take on the additional burden of second guessing the disciplinary actions taken by school administrators in addressing misconduct, something this Court has consistently refused to do." Brief for Respondents 12–13 (citation omitted).

See also Brief for Independent Women's Forum as *Amicus Curiae* 19 (questioning whether "at the primary and secondary school level" it is proper to label "sexual misconduct by students" as "sexual harassment" because there is no power relationship between the harasser and the victim).

Likewise, the majority's assertion that *Gebser* and *Franklin* settled the question is little more than *ipse dixit*. *Gebser* and *Franklin* themselves did nothing more than cite *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 64 (1986), a Title VII case, for the proposition that "when a su-

pervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." See *Franklin, supra,* at 74; *Gebser,* 524 U. S., at 282–283. To treat that proposition as establishing that the student conduct at issue here is gender discrimination is to erase, in one stroke, all differences between children and adults, peers and teachers, schools and workplaces.

In reality, there is no established body of federal or state law on which courts may draw in defining the student conduct that qualifies as Title IX gender discrimination. Analogies to Title VII hostile environment harassment are inapposite, because schools are not workplaces and children are not adults. The norms of the adult workplace that have defined hostile environment sexual harassment, see, *e. g., Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75 (1998), are not easily translated to peer relationships in schools, where teenage romantic relationships and dating are a part of everyday life. Analogies to Title IX teacher sexual harassment of students are similarly flawed. A teacher's sexual overtures toward a student are always inappropriate; a teenager's romantic overtures to a classmate (even when persistent and unwelcome) are an inescapable part of adolescence.

The majority admits that, under its approach, "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Ante,* at 651 (citations omitted). The majority does not explain how a school is supposed to discern from this mishmash of factors what is actionable discrimination. Its multifactored balancing test is a far cry from the clarity we demand of Spending Clause legislation.

The difficulties schools will encounter in identifying peer sexual harassment are already evident in teachers' manuals

designed to give guidance on the subject. For example, one teachers' manual on peer sexual harassment suggests that sexual harassment in kindergarten through third grade includes a boy being "put down" on the playground "because he wants to play house with the girls" or a girl being "put down because she shoots baskets better than the boys." Minnesota Dept. of Education, Girls and Boys Getting Along: Teaching Sexual Harassment Prevention in the Elementary Classroom 65 (1993). Yet another manual suggests that one student saying to another, "You look nice," could be sexual harassment, depending on the "tone of voice," how the student looks at the other, and "who else is around." N. Stein & L. Sjostrom, Flirting or Hurting? A Teacher's Guide on Student-to-Student Sexual Harassment in Schools (Grades 6 through 12), p. 14 (1994). Blowing a kiss is also suspect. *Ibid.* This confusion will likely be compounded once the sexual harassment label is invested with the force of federal law, backed up by private damages suits.

The only guidance the majority gives schools in distinguishing between the "simple acts of teasing and name-calling among school children," said not to be a basis for suit even when they "target differences in gender," *ante*, at 652, and actionable peer sexual harassment is, in reality, no guidance at all. The majority proclaims that "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Ibid.* The majority does not even purport to explain, however, what constitutes an actionable denial of "equal access to education." Is equal access denied when a girl who tires of being chased by the boys at recess refuses to go outside? When she cannot concentrate during class because she is worried about the recess activities? When she pretends to be sick one day so she can stay home from school? It appears the majority is content to let juries decide.

The majority's reference to a "systemic effect," *ante*, at 653, does nothing to clarify the content of its standard. The majority appears to intend that requirement to do no more than exclude the possibility that a single act of harassment perpetrated by one student on one other student can form the basis for an actionable claim. That is a small concession indeed.

The only real clue the majority gives schools about the dividing line between actionable harassment that denies a victim equal access to education and mere inappropriate teasing is a profoundly unsettling one: On the facts of this case, petitioner has stated a claim because she alleged, in the majority's words, "that the harassment had a concrete, negative effect on her daughter's ability to receive an education." *Ante*, at 654. In petitioner's words, the effects that might have been visible to the school were that her daughter's grades "dropped" and her "ability to concentrate on her school work [was] affected." App. to Pet. for Cert. 97a. Almost all adolescents experience these problems at one time or another as they mature.

## III

The majority's inability to provide any workable definition of actionable peer harassment simply underscores the myriad ways in which an opinion that purports to be narrow is, in fact, so broad that it will support untold numbers of lawyers who will prove adept at presenting cases that will withstand the defendant school districts' pretrial motions. Each of the barriers to runaway litigation the majority offers us crumbles under the weight of even casual scrutiny.

For example, the majority establishes what sounds like a relatively high threshold for liability—"denial of equal access" to education—and, almost in the same breath, makes clear that alleging a decline in grades is enough to survive Federal Rule of Civil Procedure 12(b)(6) and, it follows, to state a winning claim. The majority seems oblivious to the

fact that almost every child, at some point, has trouble in school because he or she is being teased by his or her peers. The girl who wants to skip recess because she is teased by the boys is no different from the overweight child who skips gym class because the other children tease her about her size in the locker room; or the child who risks flunking out because he refuses to wear glasses to avoid the taunts of "four-eyes"; or the child who refuses to go to school because the school bully calls him a "scaredy-cat" at recess. Most children respond to teasing in ways that detract from their ability to learn. The majority's test for actionable harassment will, as a result, sweep in almost all of the more innocuous conduct it acknowledges as a ubiquitous part of school life.

The string of adjectives the majority attaches to the word "harassment"—"severe, pervasive, and objectively offensive"—likewise fails to narrow the class of conduct that can trigger liability, since the touchstone for determining whether there is Title IX liability is the effect on the child's ability to get an education. *Ante*, at 650. Indeed, the Court's reliance on the impact on the child's educational experience suggests that the "objective offensiveness" of a comment is to be judged by reference to a reasonable child at whom the comments were aimed. Not only is that standard likely to be quite expansive, it also gives schools—and juries—little guidance, requiring them to attempt to gauge the sensitivities of, for instance, the average seven-year-old.

The majority assures us that its decision will not interfere with school discipline and instructs that, "as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Ante*, at 648. The obvious reason for the majority's expressed reluctance to allow courts and litigants to second-guess school disciplinary decisions is that school officials are usually in the best position to judge the seriousness of alleged harassment and to devise an appropriate response. The problem is that the majority's test, in fact, invites courts

and juries to second-guess school administrators in every case, to judge in each instance whether the school's response was "clearly unreasonable." A reasonableness standard, regardless of the modifier, transforms every disciplinary decision into a jury question. Cf. *Doe* v. *University of Illinois*, 138 F. 3d 653, 655 (CA7 1998) (holding that college student had stated a Title IX claim for peer sexual harassment even though school officials had suspended two male students for 10 days and transferred another out of her biology class).

Another professed limitation the majority relies upon is that the recipient will be liable only where the acts of student harassment are "known." See, *e. g., ante,* at 644, 647. The majority's enunciation of the standard begs the obvious question: known to whom? Yet the majority says not one word about the type of school employee who must know about the harassment before it is actionable.

The majority's silence is telling. The deliberate indifference liability we recognized in *Gebser* was predicated on notice to "an official of the recipient entity with authority to take corrective action to end the discrimination." 524 U. S., at 290. The majority gives no indication that it believes the standard to be any different in this context and—given its extensive reliance on the *Gebser* standard throughout the opinion—appears to adopt the *Gebser* notice standard by implication. At least the courts adjudicating Title IX peer harassment claims are likely to so conclude.

By choosing not to adopt the standard in explicit terms, the majority avoids having to confront the bizarre implications of its decision. In the context of teacher harassment, the *Gebser* notice standard imposes some limit on school liability. Where peer harassment is the discrimination, however, it imposes no limitation at all. In most cases of student misbehavior, it is the teacher who has authority, at least in the first instance, to punish the student and take other measures to remedy the harassment. The anomalous result will be that, while a school district cannot be held liable for

a teacher's sexual harassment of a student without notice to the school board (or at least to the principal), the district can be held liable for a teacher's failure to remedy peer harassment. The threshold for school liability, then, appears to be lower when the harasser is a student than when the harasser is a teacher who is an agent of the school. The absurdity of this result confirms that it was neither contemplated by Congress nor anticipated by the States.

The majority's limitations on peer sexual harassment suits cannot hope to contain the flood of liability the Court today begins. The elements of the Title IX claim created by the majority will be easy not only to allege but also to prove. A female plaintiff who pleads only that a boy called her offensive names, that she told a teacher, that the teacher's response was unreasonable, and that her school performance suffered as a result, appears to state a successful claim.

There will be no shortage of plaintiffs to bring such complaints. Our schools are charged each day with educating millions of children. Of those millions of students, a large percentage will, at some point during their school careers, experience something they consider sexual harassment. A 1993 study by the American Association of University Women Educational Foundation, for instance, found that "fully 4 out of 5 students (81%) report that they have been the target of some form of sexual harassment during their school lives." Hostile Hallways: The AAUW Survey on Sexual Harassment in America's Schools 7 (1993). The number of potential lawsuits against our schools is staggering.

The cost of defending against peer sexual harassment suits alone could overwhelm many school districts, particularly since the majority's liability standards will allow almost any plaintiff to get to summary judgment, if not to a jury. In addition, there are no damages caps on the judicially implied private cause of action under Title IX. As a result, school liability in one peer sexual harassment suit could approach, or even exceed, the total federal funding of many school dis-

tricts. Petitioner, for example, seeks damages of $500,000 in this case. App. to Pet. for Cert. 101a. Respondent school district received approximately $679,000 in federal aid in 1992–1993. Brief for School *Amici* 25, n. 20. The school district sued in *Gebser* received only $120,000 in federal funds a year. 524 U. S., 289–290. Indeed, the entire 1992–1993 budget of that district was only $1.6 million. See Tr. of Oral Arg. in No. 96–1866, p. 34.

The limitless liability confronting our schools under the implied Title IX cause of action puts schools in a far worse position than businesses; when Congress established the express cause of action for money damages under Title VII, it prescribed damages caps. See *Gebser, supra,* at 286 ("It was not until 1991 that Congress made damages available under Title VII, and even then, Congress carefully limited the amount recoverable in any individual case, calibrating the maximum recovery to the size of the employer. See 42 U. S. C. § 1981a(b)(3). Adopting petitioner's position would amount, then, to allowing unlimited recovery of damages under Title IX where Congress has not spoken on the subject of either the right or the remedy, and in the face of evidence that when Congress expressly considered both in Title VII it restricted the amount of damages available"). In addition, in contrast to Title VII, Title IX makes no provision for agency investigation and conciliation of complaints (prior to the filing of a case in federal court) that could weed out frivolous suits or settle meritorious ones at minimal cost.

The prospect of unlimited Title IX liability will, in all likelihood, breed a climate of fear that encourages school administrators to label even the most innocuous of childish conduct sexual harassment. It would appear to be no coincidence that, not long after the DOE issued its proposed policy guidance warning that schools could be liable for peer sexual harassment in the fall of 1996, see 61 Fed. Reg. 42728, a North Carolina school suspended a 6-year-old boy who kissed a female classmate on the cheek for sexual harassment, on the

theory that "[u]nwelcome is unwelcome at any age." Los Angeles Times, Sept. 25, 1996, p. A11. A week later, a New York school suspended a second grader who kissed a classmate and ripped a button off her skirt. Buffalo News, Oct. 2, 1996, p. A16. The second grader said that he got the idea from his favorite book "Corduroy," about a bear with a missing button. *Ibid.* School administrators said only, "We were given guidelines as to why we suspend children. We follow the guidelines." *Ibid.*

At the college level, the majority's holding is sure to add fuel to the debate over campus speech codes that, in the name of preventing a hostile educational environment, may infringe students' First Amendment rights. See *supra,* at 667. Indeed, under the majority's control principle, schools presumably will be responsible for remedying conduct that occurs even in student dormitory rooms. As a result, schools may well be forced to apply workplace norms in the most private of domains.

Even schools that resist overzealous enforcement may find that the most careful and reasoned response to a sexual harassment complaint nonetheless provokes litigation. Speaking with the voice of experience, the school *amici* remind us, "[h]istory shows that, no matter what a school official chooses to do, someone will be unhappy. Student offenders almost always view their punishment as too strict, and student complainants almost always view an offender's punishment as too lax." Brief for School *Amici* 12 (footnotes omitted).

A school faced with a peer sexual harassment complaint in the wake of the majority's decision may well be beset with litigation from every side. One student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process. Another student's demand for a harassment-free classroom will conflict with the alleged harasser's claim to a mainstream placement under the IDEA or with his state constitutional right to a continuing, free public education. On college campuses, and

even in secondary schools, a student's claim that the school should remedy a sexually hostile environment will conflict with the alleged harasser's claim that his speech, even if offensive, is protected by the First Amendment. In each of these situations, the school faces the risk of suit, and maybe even multiple suits, regardless of its response. See *Doe* v. *University of Illinois*, 138 F. 3d, at 679 (Posner, C. J., dissenting from denial of rehearing en banc) ("Liability for failing to prevent or rectify sexual harassment of one student by another places a school on a razor's edge, since the remedial measures that it takes against the alleged harasser are as likely to expose the school to a suit by him as a failure to take those measure[s] would be to expose the school to a suit by the victim of the alleged harassment").

The majority's holding in this case appears to be driven by the image of the school administration sitting idle every day while male students commandeer a school's athletic field or computer lab and prevent female students from using it through physical threats. See *ante*, at 650–651. Title IX might provide a remedy in such a situation, however, without resort to the majority's unprecedented theory of school liability for student harassment. If the school usually disciplines students for threatening each other and prevents them from blocking others' access to school facilities, then the school's failure to enforce its rules when the boys target the girls on a widespread level, day after day, may support an inference that the school's decision not to respond is itself based on gender. That pattern of discriminatory response could form the basis of a Title IX action.

(Contrary to the majority's assertion, see *ante*, at 653, I do not suggest that mere indifference to gender-based mistreatment—even if widespread—is enough to trigger Title IX liability. I suggest only that a clear pattern of discriminatory enforcement of school rules could raise an inference that the school itself is discriminating. Recognizing that the school itself might discriminate based on gender in the en-

forcement of its rules is a far cry from recognizing Title IX liability based on the majority's expansive theory that a school "subjects" its students to third-party discrimination when it has some control over the harasser and fails to take corrective action.)

Even more important, in most egregious cases the student will have state-law remedies available to her. The student will often have recourse against the offending student (or his parents) under state tort law. In some cases, like this one, the perpetrator may also be subject to criminal sanctions. And, as the majority notes, the student may, in some circumstances, have recourse against the school under state law. *Ante*, at 644.

Disregarding these state-law remedies for student misbehavior and the incentives that our schools already have to provide the best possible education to all of their students, the majority seeks, in effect, to put an end to student misbehavior by transforming Title IX into a Federal Student Civility Code. See Brief for Independent Women's Forum as *Amicus Curiae* 2 (urging the Court to avoid that result). I fail to see how federal courts will administer school discipline better than the principals and teachers to whom the public has entrusted that task or how the majority's holding will help the vast majority of students, whose educational opportunities will be diminished by the diversion of school funds to litigation. The private cause of action the Court creates will justify a corps of federal administrators in writing regulations on student harassment. It will also embroil schools and courts in endless litigation over what qualifies as peer sexual harassment and what constitutes a reasonable response.

In the final analysis, this case is about federalism. Yet the majority's decision today says not one word about the federal balance. Preserving our federal system is a legitimate end in itself. It is, too, the means to other ends. It ensures that essential choices can be made by a government

more proximate to the people than the vast apparatus of federal power. Defining the appropriate role of schools in teaching and supervising children who are beginning to explore their own sexuality and learning how to express it to others is one of the most complex and sensitive issues our schools face. Such decisions are best made by parents and by the teachers and school administrators who can counsel with them. The delicacy and immense significance of teaching children about sexuality should cause the Court to act with great restraint before it displaces state and local governments.

Heedless of these considerations, the Court rushes onward, finding that the cause of action it creates is necessary to effect the congressional design. It is not. Nothing in Title IX suggests that Congress intended or contemplated the result the Court reaches today, much less dictated it in unambiguous terms. Today's decision cannot be laid at the feet of Congress; it is the responsibility of the Court.

The Court must always use great care when it shapes private causes of action without clear guidance from Congress, but never more so than when the federal balance is at stake. As we recognized in Gebser, the definition of an implied cause of action inevitably implicates some measure of discretion in the Court to shape a sensible remedial scheme. 524 U. S., at 284. Whether the Court ever should have embarked on this endeavor under a Spending Clause statute is open to question. What should be clear beyond any doubt, however, is that the Court is duty bound to exercise that discretion with due regard for federalism and the unique role of the States in our system. The Court today disregards that obligation. I can conceive of few interventions more intrusive upon the delicate and vital relations between teacher and student, between student and student, and between the State and its citizens than the one the Court creates today by its own hand. Trusted principles of federalism are superseded by a more contemporary imperative.

Perhaps the most grave, and surely the most lasting, disservice of today's decision is that it ensures the Court's own disregard for the federal balance soon will be imparted to our youngest citizens. The Court clears the way for the Federal Government to claim center stage in America's classrooms. Today's decision mandates to teachers instructing and supervising their students the dubious assistance of federal court plaintiffs and their lawyers and makes the federal courts the final arbiters of school policy and of almost every disagreement between students. Enforcement of the federal right recognized by the majority means that federal influence will permeate everything from curriculum decisions to day-to-day classroom logistics and interactions. After today, Johnny will find that the routine problems of adolescence are to be resolved by invoking a federal right to demand assignment to a desk two rows away.

As its holding makes painfully clear, the majority's watered-down version of the Spending Clause clear-statement rule is no substitute for the real protections of state and local autonomy that our constitutional system requires. If there be any doubt of the futility of the Court's attempt to hedge its holding about with words of limitation for future cases, the result in this case provides the answer. The complaint of this fifth grader survives and the school will be compelled to answer in federal court. We can be assured that like suits will follow—suits, which in cost and number, will impose serious financial burdens on local school districts, the taxpayers who support them, and the children they serve. Federalism and our struggling school systems deserve better from this Court. I dissent.