# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3047
_____

Elizabeth M. Shank

*Plaintiff - Appellant*

v.

Carleton College

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 21, 2020
Filed: April 2, 2021
_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

From 2011 to 2015, Elizabeth Shank was an undergraduate student at Carleton College, a liberal arts college in Northfield, Minnesota. She claims that, while she was a student, two different male Carleton students sexually assaulted her in the

college's dormitories.[1]  Shank filed suit against the college, alleging that it mishandled the sexual misconduct disciplinary process and committed other acts of deliberate indifference in the wake of the first assault.  Though Shank also alleges the college discouraged her from seeking disciplinary action against the student involved in the second assault, her claims arise primarily from the first assault. Shank seeks relief under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681, the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12182(b)(2)(A)(ii), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Minnesota common law.  The district court[2] granted summary judgment in favor of Carleton on all claims.  Shank now appeals, and we affirm.

I.

Four days after Shank arrived on campus in early September 2011 to begin her freshman year, she was raped by Student One, another freshman who lived on the same dorm floor.  Though the encounter began as consensual kissing, Shank contends it became nonconsensual.  Both she and Student One were intoxicated.

Shank initially did not report the rape and continued living on the same floor as Student One.  When she returned to campus after winter break in January or February 2012, she noticed posters promoting the college's track team, including on doors in her dorm.  Some of the posters featured a shirtless Student One with the

---

[1]The facts of the sexual encounters that gave rise to this case are not material to the questions before us, and we do not comment on them.  At this stage, though, we must construe the facts in the light most favorable to Shank, see Elec. Power Sys. Int'l, Inc. v. Zurich Am. Ins. Co., 880 F.3d 1007, 1009 (8th Cir. 2018), so we will generally refer to these interactions as "rape."  At times, we will also use the term "sexual assault," which we mean to encompass "[s]exual intercourse with another person who does not consent," Sexual Assault, Black's Law Dictionary (11th ed. 2019), i.e. rape, as well as other nonconsensual sexual contact.

[2]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

headline "Carleton Track and Field" and the phrase "Go Hard" placed over Student One's upper thighs. Seeing these posters caused Shank to experience symptoms of post-traumatic stress disorder and suicidal ideation. Her roommate sought help from a college administrator and, on February 12, 2012, Shank was placed on 72-hour suicide watch at a local hospital. Shank's hospital discharge summary states, "She says that she was raped while intoxicated with alcohol in September 2011, by another student at the college and the student is living in the same dorm in the same floor and he is also on the track and field team, and he has posters of him all over the school."

The same day Shank was hospitalized, Joe Baggot, Associate Dean of Students for the freshman class, submitted a Community Concern Form (CCF)[3] advising college administrators that Shank "had a history of self harm and was involved in a sexual situation Fall term with another student where there was sexual intercourse and no consent given." This was the first time Carleton administrators learned about the rape, though they did not yet know the identity of the other student involved. After Shank was discharged from the hospital on February 15, 2012, she met with Baggot. She told him that seeing posters of Student One around campus "triggered the memories of violence" associated with the rape, which she "had been, sort of, in denial [of] for awhile," and made her feel "trapped." Although she did not specifically ask college administrators to take the posters down, Shank asserts they should have done so. After the meeting with Shank, Baggot emailed other administrators that Shank "understood how to file a [sexual misconduct] complaint with the college if she wanted to do so and that [Shank] certainly did NOT want to do so."

Carleton's student safety handbook states that sexual assault complainants have access to support from the college, including assignment to alternative housing, but Shank maintains that no one associated with Carleton told her she could move

---

[3]Any member of the Carleton community may submit a CCF to express concern about the wellbeing or behavior of another community member. CCFs are routed to the college administrator in charge of the type of concern raised.

to a different dorm to avoid crossing paths with Student One. Eventually, a friend's mother suggested that she request a new dorm assignment. Shank raised the issue with Baggot in early April 2012, and he advised her to contact the college's Residential Life Office. She did so and by April 12, 2012 had moved to a single room in a different dorm. The posters of Student One were still hanging in the stairwells of her old dorm when she moved. At this point, Shank had not yet disclosed Student One's name to Carleton administrators.

Around this same time, Shank learned that Carleton had offered Student One a Resident Assistant (RA) position for the following academic year. This troubled her and, on April 19, 2012, a friend submitted a CCF on her behalf identifying Student One; this CCF marked the first time the college was informed that Student One was the individual who raped Shank in September 2011. The CCF prompted Amy Sillanpa, Carleton's Associate Director of Residential Life and Sexual Misconduct Complaint Process Coordinator, to schedule a meeting with Shank. At their May 1, 2012 meeting, Shank expressed concern about Student One becoming an RA, and Sillanpa walked her through a "first conversation checklist," which was preliminary to Carleton's student sexual misconduct disciplinary process. The checklist described the sexual misconduct investigation and adjudication process and explained that "[e]ither party has the right to appeal the decision." Sillanpa appointed former Associate Student Dean Cathy Carlson to serve as Shank's Sexual Misconduct Support Advisor. The parties do not dispute that at this point Shank was "not decisive if she wanted to go forward with the complaint or not."

Shank remained reluctant to file a complaint against Student One, and Carleton administrators ultimately decided to file their own complaint against him on behalf of the college. Shank planned to participate in the adjudicatory process by providing a written statement describing her version of events. On May 16, 2012, she asked Carlson whether "I still have any chance to back out [of writing a statement], or is it too late for that since the college is involved." Carlson responded that while it was up to Shank whether to provide a statement, "[t]he college [was] likely to still move[] forward based on the information from the community concern

forms and from the text you provided [us]."[4]  Shank submitted her draft statement two days later.  It described what happened with Student One and stated that "[t]his written statement does not constitute a formal sexual misconduct complaint" and that she would "allow the administration to decide how to properly respond to the information" it contained.

Sexual misconduct complaints are adjudicated by Carleton's Community Board on Sexual Misconduct (CBSM), comprised of faculty, staff, and students.  In advance of the planned CBSM hearing, Carleton appointed one of its Title IX Coordinators to investigate the college's complaint against Student One.  The investigator interviewed Student One but relied on Shank's draft statement describing the rape instead of speaking with her personally.  Carlson asked Shank if she would like to "submit any other information" for the CBSM to consider.  At Shank's request, Carlson then provided the CBSM with additional information on her behalf, including that Shank would like "closure," which "could be in the form of a mediated conversation between Student One and [Shank] concerning the nature of future interactions at Carleton."  Shank does not remember discussing such a proposal with Carlson.  College administrators did not allow Shank to see the final investigative summary.

The CBSM conducted a sexual misconduct hearing regarding Student One on May 30, 2012, and concluded he had violated Carleton's sexual misconduct policy.  Consequently, the CBSM placed Student One on disciplinary probation, issued a no-contact order prohibiting him from interacting with Shank, withdrew his offer to serve as an RA, and required that he attend counseling.  The board's decision further stated that if Shank is "still interested in a mediated conversation . . . the board supports this conversation to take place and [be] mediated by a staff member in Student Health and Counseling."  With the exception of the no-contact order, Carleton did not tell Shank what sanctions had been imposed on Student One.

---

[4]Though Carlson uses the word "text," it appears she was referring to a Facebook message Student One sent Shank apologizing for not "seek[ing] consent."

-5-

The following semester, in late September 2012, Shank told Carlson that it was almost "comical" how frequently she saw Student One around campus despite the no-contact order. She later testified that she "would drink to cope with it, like, yeah, just, like, upon seeing him." Around this time, Shank's parents emailed Carleton to complain that the sanctions imposed on Student One were insufficient and expressed their desire to appeal the board's decision. One of the college's Title IX administrators explained that allowing Shank to appeal would be "procedurally . . . not possible since [Shank] did not participate" as a party to the disciplinary process.

During October 2012, Carleton administrators arranged a meeting between Shank and Student One, the purpose of which was "for both [students] to talk about the incident which happened last fall and to determine ways to move forward." In preparation, Shank emailed Carlson proposed guidelines for the conversation. The meeting went forward on October 15, 2012, in a Carleton administrator's office. Shank and Student One met alone while Carlson remained in the room next door. Shank testified that during the meeting she felt "frozen, like, wanting to knock on the wall [to get Carlson's attention], but I couldn't. Just like I wanted to, like, during the rape." It was at this meeting that Student One asked Shank to lift the no-contact order. She agreed, and the order was lifted, but she quickly came to regret it. Shank described the rest of her time at Carleton as a game of "cat and mouse," explaining that she took "round about routes in order not to run into [him]," avoided the dining halls, and had "difficulty attending classes" because she feared seeing him.

In early 2015, during Shank's senior year, she met with Carleton's Dean of Students about reinstating the no-contact order. At that time, Shank described the rape as more violent than she had previously disclosed, and the college reinstated the no-contact order on January 15. Shank met with the Dean of Students again in March and told her she wanted Student One expelled or suspended from campus. Five days later, Carleton sent Student One a letter informing him that he had violated the no-contact order by attending a February event hosted by the Computer Science

Department, which Shank also attended. As a result of the violation, Student One was instructed to complete the remainder of his last semester of college off campus.

The factual record concerning Student Two, a senior who lived in Shank's sophomore year dorm, is less developed. Shank asserts that Student Two raped her in their dorm on April 6, 2013. According to Shank, Carlson dissuaded her from filing a formal complaint about the assault and encouraged her to instead "focus on school" as Student Two would be graduating soon. A week later, Shank emailed Carlson, stating, "I don't think I can handle having my name attached to anything involving [Student Two] right now." Three weeks later, Shank and three other female students submitted CCFs expressing concern about Student Two's "behavior towards women, especially in situations where alcohol is served." In response, Carleton issued a no-contact order prohibiting Student Two from interacting with Shank and the other complainants. This appears to have been the end of the college's inquiry into Student Two's actions.

II.

We review de novo a grant of summary judgment, "construing all facts and making all reasonable inferences favorable to the nonmovant." Elec. Power Sys. Int'l, Inc. v. Zurich Am. Ins. Co., 880 F.3d 1007, 1009 (8th Cir. 2018) (quoting Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 670 (8th Cir. 2013)). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has the obligation to come forward with specific facts showing that there is a genuine issue for trial." Walz v. Ameriprise Fin., Inc., 779 F.3d 842, 844 (8th Cir. 2015) (quoting B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist., 732 F.3d 882, 886 (8th Cir. 2013)). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has identified sexual harassment, including student-on-student sexual harassment, as a form of sex discrimination for Title IX purposes. Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999). The statute thus affords victims of student-on-student sexual harassment a private right of action for damages against educational institutions that receive federal funding. See Davis, 526 U.S. at 633. This court treats peer sexual assault as a form of sex discrimination for Title IX purposes. See, e.g., K.T. v. Culver-Stockton Coll., 865 F.3d 1054, 1058–59 (8th Cir. 2017); Maher v. Iowa State Univ., 915 F.3d 1210, 1213 (8th Cir. 2019).

A student who sues an educational institution under Title IX may hold it liable but "only for its own misconduct." Davis, 526 U.S. at 640. A plaintiff seeking to prove a Title IX violation in the wake of a peer sexual assault must establish that the institution was: (1) "deliberately indifferent," (2) "to known acts of discrimination," (3) "which occurred under its control." Pearson v. Logan Univ., 937 F.3d 1119, 1125 (8th Cir. 2019) (per curiam) (cleaned up) (quoting Culver-Stockton Coll., 865 F.3d at 1057). A Title IX plaintiff is also required to show the discrimination was "so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." Id. (quoting Culver-Stockton Coll., 865 F.3d at 1057).

An institution is deliberately indifferent when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648; see Doe v. Dardanelle Sch. Dist., 928 F.3d 722, 725 (8th Cir. 2019) (describing deliberate indifference as "a stringent standard of fault that cannot be predicated upon mere negligence" (quoting Doe v. Flaherty, 623 F.3d 577, 584 (8th Cir. 2010)). Critically, the institution's deliberate indifference must "cause[]

-8-

students to undergo harassment" or "ma[ke] them liable or vulnerable to it." Davis, 526 U.S. at 645; see Ostrander v. Duggan, 341 F.3d 745, 750 (8th Cir. 2003) (stating that the institution's deliberate indifference must "directly cause the abuse to occur or make students vulnerable to such abuse"). This requires a Title IX plaintiff to demonstrate a "causal nexus" between the college's conduct and the student's experience of sexual harassment or assault. Culver-Stockton Coll., 865 F.3d at 1058.

Shank argues that Carleton's response to the sexual assaults was clearly unreasonable, and that the district court failed to draw all reasonable inferences in her favor when it concluded otherwise. She points to several incidents that she believes create a genuine issue of material fact regarding whether Carleton's response amounted to deliberate indifference for purposes of Title IX. These include Carleton's actions when it limited Shank's participation in the adjudicatory process; permitted Shank to meet one-on-one with Student One; failed to remove posters of Student One from campus; and did not promptly find Shank new accommodations on campus.

As to the first incident, the undisputed facts show that Carleton advised Shank about the college's sexual misconduct disciplinary process and her right to file a complaint and that, by May 2012, she had not filed one. Shank does not argue that Carleton prevented her from filing a complaint, but instead that Carleton did not wait for her to make a final decision on whether to do so. Carleton's decision to initiate its own complaint came shortly after it learned the identity of Student One. And Shank was told of the college's intent. The college was particularly concerned about investigating the allegations against Student One in light of the fact that it had recently offered him an RA position. The record contains no evidence that Carleton restricted Shank's ability to file her own complaint either at the same time as the college or at a later date, had she chosen to do so.

Shank's role in adjudicating the complaint against Student One was, as she points out, more limited than if she had filed the complaint herself. Carleton's policy governing the process for initiating and adjudicating student sexual misconduct

complaints left it up to the student to decide whether to make a formal complaint about sexual misconduct. It did not contemplate a situation in which the victim of a sexual assault does not file a complaint but the college decides to pursue disciplinary action anyway, nor did it delineate the role of a victim in disciplinary proceedings initiated by the college. Viewing the facts in the light most favorable to Shank, Carleton's lack of procedures for this type of situation points out a weak spot in the college's sexual assault policy. Cf. Doe v. Univ. of Arkansas – Fayetteville, 974 F.3d 858, 868 (8th Cir. 2020) (illustrating that a university's sexual misconduct disciplinary procedures must protect the interests of a student victim of sexual assault as well as those of a student accused of sexual assault).

But the question is not whether Carleton's policy should have been more comprehensive. Rather, it is whether the college's response to the sexual assault by Student One amounted to deliberate indifference. On this record, we cannot say that a reasonable jury would conclude that it did. Shank had the opportunity to submit a written statement, which the board considered and credited in full. Perhaps Carleton could have made an exception and allowed Shank, as an interested party, to appeal the sanctions against Student One, as she later requested to do. But it was not clearly unreasonable for the college to decline that request. See Davis, 526 U.S. at 648 (admonishing that courts "should refrain from second-guessing the disciplinary decisions made by school administrators"). Shank also criticizes the college for preventing her from testifying, reading Student One's statement, or reviewing the investigative report. But again, it is undisputed that Shank was not a party to these sexual misconduct proceedings; it was not plainly unreasonable for Carleton not to include her in the process as if she were. Construing the record in Shank's favor, we agree with the district court that she has not created a genuine dispute of material fact as to whether Carleton handled the disciplinary process in a deliberately indifferent manner. The college's actions were not "clearly unreasonable in light of the known circumstances," id., nor has Shank presented evidence that they "caused her to undergo harassment, made her vulnerable to it, or subjected her to further discrimination." Culver-Stockton Coll., 865 F.3d at 1057. The record does not

warrant second-guessing the college's decisions in the context of the sexual misconduct hearing.

Shank also asserts that Carleton acted with deliberate indifference when it permitted her to meet one-on-one with Student One. According to Shank, it was Carleton that proposed the meeting. She offered evidence that these types of meetings are not appropriate to resolve sexual assault allegations, even when both sides participate voluntarily. Shank also described how she "froze" when she met with Student One alone in a closed room, which reminded her of how she felt during the rape. Yet the record shows that Shank set the terms of the meeting, which she agrees were met, and there is no evidence that the college required or forced her to participate.

Shank testified that she decided to meet with Student One to find out what additional sanctions were imposed on him, in the hopes of reporting any violations of those sanctions to the college. According to Shank, the meeting was coerced because college administrators had not shared the details of Student One's sanctions with her, making a meeting the only way to learn what the sanctions were, catch him in a violation, and force his expulsion. She regrets participating in the meeting and asserts that Carleton should have known all along that it was not a good idea. But acknowledging that the meeting was not a good idea is not the same as saying Shank was coerced into participating. Given the circumstances facing both the college and Shank, we agree with the district court that permitting the meeting to take place, after the sexual assault proceedings had concluded, was not an act of deliberate indifference. And even if it was, it is far from clear that requiring Shank to attend the meeting would have violated Title IX. She has not presented evidence that the meeting "caused" her to experience sexual harassment or made her "vulnerable to it." See Davis, 526 U.S. at 645 (cleaned up).

Shank further claims that Carleton's handling of the posters of Student One amounted to deliberate indifference. There is no dispute that the posters exacerbated Shank's trauma. As the district court observed, the record "would permit a

reasonable juror to conclude that Shank suffered adverse health consequences as a result of encountering the posters and that Carleton knew this." The record shows that Shank first saw the posters when she returned to campus following winter break, in January or February 2012, and that shortly after her hospitalization on February 12, 2012, she told Baggot how the posters made her feel. Yet, according to Shank, the posters were still hanging in the dorm in April 2012 when she moved.

Carleton's failure to remove the posters, coupled with its delay in giving Shank the opportunity to promptly move to a new dorm, is a matter of some concern. Carleton did not know the identity of Student One until after Shank moved to the new dorm, and the record indicates there was more than one athlete depicted in similar posters. But Carleton knew by February 12, 2012 that the student who raped her lived on her floor, and did not provide her with alternative housing until two months later, when Shank expressly requested it. Based on the record before us, removing the posters would have lessened the trauma Shank experienced after the rape and before she moved out of the dorm where they were hanging.

Even assuming that posters qualify as sexual harassment for purposes of Title IX liability, however, the record evidence fails to support a finding that not removing the posters amounted to "deliberate[] indifferen[ce] . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive [Shank] of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650; see Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 782 (8th Cir. 2001) ("[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse."). Similarly, accepting the assertion that Carleton should have offered alternative housing sooner, Shank has not offered evidence to support the conclusion that the college's shortcoming in this regard deprived her of the educational opportunities or benefits to which she was entitled. See Pearson, 937 F.3d at 1125.

Finally, the evidence does not show that Carleton's conduct in the wake of Shank's complaint concerning Student Two was "clearly unreasonable in light of

the known circumstances." Davis, 526 U.S. at 648. The record establishes that Shank declined to file a formal complaint against Student Two. The college nonetheless instituted a no-contact order prohibiting Student Two from interacting with her. There is no evidence to suggest that Carleton's actions were clearly unreasonable or that they exposed Shank to additional sexual harassment.

Under governing precedent, a Title IX plaintiff must demonstrate a "causal nexus" between the college's conduct and the student's experience of sexual harassment. Culver-Stockton Coll., 865 F.3d at 1058. Linking the college's actions or inactions to emotional trauma the plaintiff experienced in the wake of sexual harassment or assault, even if proven, is not enough. See id.; Davis, 526 U.S. at 644–45. Shank's evidence fails to support the necessary causal nexus, and summary judgment on her Title IX claim was therefore appropriate.

IV.

Under Title III of the ADA, it is unlawful for "any place of public accommodation" to "fail[] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii). To prevail on her ADA and Section 504 Rehabilitation Act claims, Shank must establish that: (1) she is disabled and otherwise qualified academically; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation and receives federal funding; and (3) the defendant "failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation."[5] Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir. 2006) (quoting Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999)).

_____

[5]The ADA is "similar in substance to the Rehabilitation Act, and cases interpreting either are applicable and interchangeable." Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 344 (8th Cir. 2006) (cleaned up) (quoting Gorman

-13-

The parties disagree only as to the final element—whether Carleton failed to provide reasonable accommodations. The record establishes that Carleton first learned of Shank's disabilities on February 23, 2015, when it received a letter from her licensed social worker explaining that Shank had been diagnosed with post-traumatic stress disorder and obsessive-compulsive disorder. See Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004) ("The known disability triggers the duty to reasonably accommodate."). Within a few days of receiving the letter, Carleton arranged for Shank to meet with Andy Christensen, the college's Coordinator of Disability Services. He readily acknowledged that Shank was entitled to reasonable accommodations and generally agreed to grant the specific accommodations she requested. Though Shank had asked that she not be required to attend class in person, Christensen proposed that her classes be moved "to spaces on campus that minimize the adverse effect of [her] disability," thus enabling her to attend class in person rather than watch recorded sessions after the fact. Shank never objected to this solution. Christensen further advised Shank that giving her extended time to complete assignments and lenient treatment of absences across the board could "backfire" in terms of keeping her academically on track. Instead, he reassured her that he would "communicate to faculty on [her] behalf related to specific deadlines as they come up." Shank has not presented evidence that Carleton failed to provide these promised accommodations, and the record shows that she was able to graduate on time in 2015. Nothing in the record suggests that Carleton denied Shank reasonable accommodations for her disabilities. Summary judgment on the ADA claim and Section 504 claim was warranted.

V.

The record in this case supports the conclusion that Shank suffered what no student should have to experience in college. Shank has also presented evidence

---

v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998)). Although there are some differences between the two acts, none are implicated here. See id. at 344.

that Carleton could have been more inclusive during the sexual assault complaint process and more attentive to Shank in the aftermath. Under Title IX, an educational institution may not engage in unlawful sex discrimination, and sex discrimination includes student-on-student sexual assault as occurred in this case. But applying the proper "stringent standard," Dardanelle Sch. Dist., 928 F.3d at 725, we agree with the district court that Shank has not presented sufficient evidence that Carleton's conduct rose to the level of deliberate indifference that caused her to experience, or made her vulnerable to, further harassment or assault, as Title IX requires. Nor does the record suggest that the college denied Shank reasonable accommodations as she endeavored to finish her degree while struggling with challenges to her mental health brought on by the sexual assaults.[6] For these reasons, we affirm the district court's entry of summary judgment.

———————————————————

[6]Because Shank provides only a single sentence in support of her state law claims on appeal, we consider them abandoned. But even had she provided more vigorous advocacy in support of these claims, we would affirm the district court's grant of summary judgment based on its thorough reasoning below.

-15-