# United States Court of Appeals

### For the Eighth Circuit

_____

No. 22-1814

_____

Jane Doe

*Plaintiff - Appellee*

v.

Board of Trustees of the Nebraska State Colleges, a Political Subdivision of the State of Nebraska

*Defendant - Appellant*

------------------------------

19 Civil Rights and Survivor Advocacy Organizations

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: January 11, 2023
Filed: August 15, 2023

_____

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

_____

ERICKSON, Circuit Judge.

The Board of Trustees of the Nebraska State Colleges ("NSCS") appeals from a jury verdict finding it acted with deliberate indifference after Jane Doe ("Doe") was sexually assaulted while attending Chadron State College ("Chadron"). We reverse and remand with directions that the district court enter judgment in favor of NSCS and vacate the award of Doe's attorney fees.

## I. BACKGROUND

During the time frame at issue, Doe worked as a campus security officer in a complex with three linked dormitories (Andrews Hall, Kent Hall, and High Rise). In May 2016, Anthony Ige visited Doe while she was at work in Andrews Hall and stole her drink. Doe followed Ige to his room where Ige groped her and tried unsuccessfully to prevent her from leaving. Later in the evening Doe returned to Ige's room, and he sexually assaulted her.

After the assault, Doe met with Robin Bila, a counselor at Chadron. Doe was circumspect during her conversation with Bila, reporting that she had an "incident" with Ige (which she preferred not to detail) and expressing concerns about sexually transmitted diseases and consent. Doe told Bila that she did not want to report Ige to the police. Bila provided information to Doe and complied with Doe's wishes not to report the assault. Doe did not report the incident to anyone else.

Throughout the summer Ige taunted Doe, although Doe did not report this conduct to Chadron. In September 2016, Ige took Doe's phone while she was working in Andrews Hall and headed to the basement. Doe followed, and Ige groped her in the stairway and sexually assaulted her in a bathroom. The next day, Doe missed an appointment with Bila. Bila texted Doe and then went to Doe's apartment. When Doe came to the door, she was distressed and disheveled. Bila brought her to the nurse's office. Doe told Bila that Ige had once again assaulted her. Bila informed Doe that she could file a Title IX complaint and that she could go to the hospital for medical treatment. Doe initially did not report Ige to the police, but she changed her

mind, and the incident was reported. Doe met with a police officer who reviewed security footage with her.

Ige was never charged; however, Chadron initiated Title IX proceedings. Chadron's Title IX policy includes two stages. In the first stage, the Title IX coordinator consults with NSCS's general counsel and decides whether further investigation is warranted. If investigation is warranted, the Title IX coordinator determines, after the investigation, whether sexual misconduct occurred, and provides a recommendation to Chadron's vice president responsible for student affairs, who has ten days to decide whether the second stage—disciplinary proceedings—should be initiated. At the time of this incident, Anne DeMersseman served as Chadron's Title IX coordinator. Once DeMersseman learned of the alleged September assault from the police department, she prepared a mutually binding no-contact order and served it on Ige at the end of his police interview. The order prohibited any contact or communication between Ige and Doe. DeMersseman also provided the order to the campus security supervisor, so he could give it to Doe.

As part of her investigation, DeMersseman interviewed Ige and Doe. DeMersseman explained to Doe the investigatory process, options related to law enforcement, and Ige's potential consequences. DeMersseman discussed counseling options with Doe, who reported that she was already seeing Bila. DeMersseman told Doe that if Ige breached the no-contact order, she should immediately call security. She also confirmed that Doe and Ige were not in any of the same classes. DeMersseman contacted Chadron's housing director with the intention of moving Ige out of the High Rise dormitory, which was connected to Andrews Hall. But after talking with the director, DeMersseman concluded that it was more sensible to ban Ige from Andrews Hall rather than move him. Ige was sent a letter banning him from Andrews Hall, and staff were notified of the ban several days later in a document that included Ige's name and photograph.

DeMersseman testified that she had difficulty reconciling Doe's and Ige's accounts and found herself conflicted after watching the video footage. She believed

-3-

the surveillance video corroborated different parts of each person's version. After repeatedly viewing the video footage, speaking to Bila, and visiting the police station to examine the evidence the police had developed, DeMersseman considered both Doe and Ige to be credible. While she viewed Ige as immature, she did not believe he was dangerous. DeMersseman ultimately concluded in her report that Ige had violated NSCS Board Policy 3020 by failing to obtain Doe's consent regarding the May and September 2016 sexual activities. The report instructed Doe to contact DeMersseman if any retaliation occurred, if Ige breached the no-contact order, or if she needed other help. The report was sent to Chadron's vice president, who decided to initiate disciplinary proceedings against Ige.

In response to DeMersseman's report, Chadron moved Doe's work assignment to Brooks Hall, a secure building with limited access and better visibility. After the move, Chadron notified Ige that he was no longer banned from Andrews Hall but was now banned from Brooks Hall. Ige waived his due process rights, and Chadron's vice president imposed the following additional sanctions on Ige: (1) he made the no-contact order permanent; (2) he required Ige to participate in weekly counseling sessions at Chadron; (3) he placed Ige on behavioral probation until he graduated; (4) he directed Ige to read a book titled The Macho Paradox: Why Some Men Hurt Women and How All Men Can Help and to participate in journaling and discussion with his counselor; and (5) he required Ige to complete an online consent and alcohol course. Chadron's vice president felt these sanctions were appropriate because Ige had not violated the initial no-contact order, Ige had cooperated with the investigation, and the punishment was consistent with the way other similar complaints had been handled. He believed it was possible to keep Doe safe without suspending or expelling Ige from campus.

Doe objected to the disciplinary sanctions, believing Ige should be removed from campus, and inquired about the options available to her, specifically asking about the possibility of completing the remainder of the term online. Chadron offered Dow the opportunity to complete her coursework off campus and security escort if she stayed on campus.

In mid-November 2016, Doe's attorney asked NSCS to provide a copy of the relevant documents for review. NSCS's Title IX director complied and asked counsel to let him know as soon as possible if Doe was seeking any other accommodations. Doe's counsel responded that Doe did not want a campus escort because it would draw attention to her. Counsel did not request any additional steps or accommodations other than stating Ige should be removed from campus. When Chadron advised Doe's counsel that security personnel could wear plainclothes, Doe's counsel did not respond.

In July 2017, Doe sued NSCS for violating Title IX and for race discrimination. Doe voluntarily dismissed the discrimination claim. After NSCS's summary judgment motion was denied, the case proceeded to trial. The district court denied NSCS's motion for judgment as a matter of law. The jury found in Doe's favor and awarded damages in the amount of $300,000. NSCS renewed its motion for judgment as a matter of law, or, alternatively, for a new trial. The district court denied both motions and awarded Doe attorney fees. NSCS appeals.

## II.    DISCUSSION

On appeal, NSCS raises three claims: (1) the Title IX claim fails as a matter of law; (2) the district court erred when it admitted the expert testimony of Dr. Charol Shakeshaft; and (3) the district court erred in awarding attorney's fees. We begin with NSCS's paramount claim that, as a matter of law, it was not deliberately indifferent after Doe reported being sexually assaulted.

A district court may render judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). We review the district court's ruling *de novo*, viewing the evidence in a light most favorable to the jury's verdict. See Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004). Our review gives great

deference to the jury's verdict and we "will not set aside a jury verdict unless there is a complete absence of probable facts to support the verdict." Id. at 769-70 (cleaned up). While we are not permitted to make credibility assessments, a reviewing court is to consider uncontradicted and unimpeached evidence in the record favoring the moving party. Id. at 770.

For Doe to prevail on her Title IX deliberate indifference claim, evidence in the record must establish that Chadron: (1) was deliberately indifferent, (2) to known acts of discrimination, (3) which occurred under its control. See Maher v. Iowa State Univ., 915 F.3d 1210, 1213 (8th Cir. 2019). Deliberate indifference is established when a school responds in a clearly unreasonable manner to harassment considering the circumstances known to it. Id. It "is a stringent standard of fault that cannot be predicated upon mere negligence." Doe v. Dardanelle Sch. Dist., 928 F.3d 722, 725 (8th Cir. 2019). Title IX is not a procedure for courts to second-guess disciplinary decisions made by school administrators. Id.

Doe focused her arguments in her brief on Chadron's response to the second assault. During oral argument, Doe's counsel confirmed that Doe's claim was premised on Chadron's conduct after the second incident. Doe has waived any claim of deliberate indifference premised on the first sexual assault reported only to Bila. See Robinson v. Norling, 25 F.4th 1061, 1062 (8th Cir. 2022) (noting an argument is waived when it is intentionally relinquished).

Viewing the evidence in a light most favorable to the jury's verdict, the uncontradicted evidence demonstrates that Chadron acted promptly—nearly immediately—upon learning of the assault. Chadron issued a mutually binding no-contact order between Doe and Ige, which was served on Ige at the end of his police interview. Chadron verified that the two students did not share the same classes, and promptly initiated an investigation to determine what happened. Chadron interviewed Doe, explained the investigatory process to her, banned Ige from Andrews Hall, and accommodated Doe academically. At the conclusion of the investigation, Chadron placed Doe in a more secure employment location and

-6-

banned Ige from that location, placed Ige on behavioral probation, required Ige to attend weekly counseling sessions and work through an appropriate text, compelled Ige to complete an online consent and alcohol class, approved Doe to complete coursework off campus if she wanted to, offered to provide Doe with a plain-clothed escort while on campus, and solicited Doe's input with regard to providing additional assistance or accommodations. These uncontroverted steps were prompt, extensive, substantive, directed to protect and assist Doe, and not clearly unreasonable given the circumstances known to Chadron.

Even if this evidence was somehow sufficient to constitute deliberate indifference, the evidence falls short on causation. For Chadron to be liable, the acts of deliberate indifference "must cause students to undergo harassment or make them liable or vulnerable to it." Shank v. Carleton Coll., 993 F.3d 567, 573 (8th Cir. 2021) (cleaned up). The reason is that Title IX creates liability for schools that accept federal funding only if they "subject" the student to abuse. 20 U.S.C. § 1681(a); cf. Du Bois v. Bd. of Regents of the Univ. of Minn., 987 F.3d 1199, 1203 (8th Cir. 2021) (defining "[d]iscrimination under Title IX [to] include[] harassment"). The fact that one student harms another is not enough. See Schrum ex rel. Kelly v. Kluck, 249 F.3d 773, 781-82 (8th Cir. 2001). Title IX requires a school to be in a position to control the situation, know of it, and still exhibit indifference. See Gebser v. Lago Vista Indep. Sch. Dist. 524 U.S. 274, 289 (1998) (requiring notice to an "appropriate person" before a funding recipient can be liable).

Applying those principles here, Doe cannot show a causal nexus between Chadron's actions and the sexual assaults or harassment. See Shank, 993 F.3d at 573. No "appropriate person" knew about the first assault, so school officials could not have predicted a second one was coming. Gebser, 524 U.S. at 289. In the words of Title IX, they could not have "subject[ed]" her to it. 20 U.S.C. § 1681(a). And once the second assault took place—and the proper administrators were notified— there were no more incidents of harassment or abuse. See Shank, 993 F.3d at 573. Doe was understandably distraught by the events, but merely "[l]inking the college's actions or inactions to emotional trauma the plaintiff experienced in the wake of

sexual harassment or assault, even if proven, is not enough." Id. at 576. In other words, Doe has not shown that Chadron caused a cognizable harm by failing to more severely discipline Ige.

While it is a rare case that reversal is warranted after giving appropriate deference to a jury's verdict, this is such a case. After examining the uncontroverted facts presented at trial, a reasonable jury could not find in Doe's favor. It is understandable that Doe wanted Ige removed from campus, or suffer more severe consequences, however, a cognizable claim requires Doe to show Chadron acted in a clearly unreasonable manner, which is not sustainable on the record. The district court erred when it failed to grant NSCS's motion for judgment as a matter of law. We need not reach the other issues raised by NSCS. Because Doe is no longer a prevailing party, we order that the award of attorney's fees be vacated.

## III. CONCLUSION

We reverse the judgment of the district court and remand to the district court with directions to enter judgment in favor of NSCS and to vacate the award of Doe's attorney's fees.

KELLY, Circuit Judge, dissenting.

Doe was a student at Chadron State College when she was sexually assaulted—twice—by a fellow student, Ige. Central to this Title IX case is whether the College's response to Doe's report of the second sexual assault was "clearly unreasonable in light of the known circumstances." Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999). Viewing the evidence in the light most favorable to the prevailing party—here, Doe—a reasonable jury could find that it was. See Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir. 2004).

Ige sexually assaulted Doe in May 2016 and again in September 2016. On September 20, 2016, Doe reported the September assault—which she described as

the second violent rape by Ige—to the College.[1]   At the time, Doe worked in Andrews Hall, a part of a three-dormitory complex that included High Rise Hall, where Ige lived.  By September 23, the College had banned Ige from Andrews Hall but failed to timely notify the dormitory, resulting in a "five-day lag between the date of a ban and the communication about the ban to the dorm."  DeMersseman testified that this "lag" was "not reasonable."  Because of the adjoining nature of the dormitory complex, which had a shared common area, it was still possible for Ige and Doe to encounter each other.  And initially, Doe understood that Ige would be banned from the entire complex.  The College, however, did not tell Doe that it had decided to "[l]eave [Ige] where he's at" and only ban him from Andrews Hall.

On September 29, Doe encountered Ige as she passed through the dormitory complex on her way to Andrews Hall for work.  Doe had a panic attack and "gave up her shift," telling her employer that she would not be able to come to work.  Doe met with DeMersseman the following day, who only then explained that Ige would not be removed from the dormitory complex.

The College soon decided instead to move Doe's workstation to another dormitory, Brooks Hall—a stand-alone residence separate from the Andrews Hall complex.  No one told Doe, or consulted her, about this decision.  Instead, on October 2, Doe arrived for work at Andrews Hall and was met by uniformed campus security officers who escorted her to her new workplace.  And the move to Brooks Hall—which Doe explained had fewer "privilege[s]" than her previous workstation at Andrews—was permanent.  The College then restored Ige's access to Andrews Hall.

---

[1]Doe also reported the first sexual assault she experienced to Bila shortly after it occurred.  But it was undisputed that Bila was not an "appropriate person" under Title IX to trigger the College's liability.  See 20 U.S.C. § 1682; Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998) (explaining that an "appropriate person" is an official of the institution who "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [institution's] behalf").

The following week, the College's vice president, Jon Hansen, sent a letter informing Ige that Doe's allegations against him qualified as an act of "sexual violence" and "unreasonably dangerous" conduct under the College's policy. Ige admitted to the policy violation. At that point, Ige could be barred from all or part of the campus if, as provided in the College's policy, he was determined to be "a continued threat . . . to the victim." But in considering Ige's sanctions, the College did not conduct a risk assessment with any defined criteria. Rather, Hansen merely used his own "judgment" to place Ige on "behavioral probation"—a status undefined by the College—and to impose modest sanctions, such as reading a book, journaling, and completing a consent course. The sanctions were loosely monitored, and several were not tailored to the type of misconduct—sexual assaults—involved.

One of Ige's sanctions was to attend weekly counseling sessions at the College's counseling center. The counseling center was in a small, enclosed basement on campus and had just two counselors. Doe regularly attended counseling sessions there and had a long-standing relationship with one of the counselors, who had assisted Doe through both sexual assaults. Once Doe learned that Ige had been directed to receive counseling at the same place, she felt "compromised" knowing that she could run into Ige in the "small basement where [students] all pass each other." At this point, Doe "didn't even want to live," but she decided to stop receiving counseling at the center even though she felt she still "needed counseling more than anything." The College did not offer her an option of counseling at another location.

The jury also heard evidence that the College left Doe on her own to monitor Ige's whereabouts on campus. Doe began to avoid the College's food hall, library, student center, and other locations on the small campus where she thought Ige might be. And she specifically stayed away from places where Ige had previously taunted her about sexually assaulting her. Doe also stopped participating in a campus organization, where she was the vice president, because the meetings were held on campus.

On October 31, Doe emailed Hansen and told him that she felt unsafe on campus and that the College had not taken sufficient steps to protect her from "someone who admitted to raping [her]." Doe said she spent time trying to "spot" Ige before he saw her so that she could "protect" herself. Hansen did not respond to Doe's email until two weeks later, when he encouraged Doe to visit the College's counseling center—the very same one Ige was now also utilizing. Doe also called DeMersseman's office multiple times, but she received no response and was left "in the dark" about "what [was] going on."

Doe soon requested alternative options for completing her education, and she emphasized that she "wanted to keep going to class" in person. But the only options Hansen offered Doe involved either completing her courses mostly online or transferring to another institution. Doe eventually gave up looking for help from the College. She did not take a "paralegal exam" or the Law School Admission Test as she had originally planned. She finished her final semester but opted to skip commencement because she was afraid Ige would attend the ceremony.

In this case, a reasonable jury could likely conclude that the College "promptly" initiated its Title IX investigation of Doe's allegations. But in determining whether the College acted with deliberate indifference, the jury was entitled to consider all of "the known circumstances"—including the extent of the College's response, the nature of its efforts to address Doe's safety concerns, and the efficacy of its remedial actions. See Davis, 526 U.S. at 648. Given the evidence presented at trial, a reasonable jury could find that the College's actions were "not reasonably calculated to end [the] harassment," Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 669 (2d Cir. 2012), and were clearly unreasonable in light of the sexual assaults that Doe suffered on campus.

This court, however, concludes that even if Doe establishes deliberate indifference, she cannot prevail because "there were no more incidents of harassment or abuse" after Doe's second sexual assault. But the plain text of Title

-11-

IX requires only that a plaintiff establish that he or she was "subjected to" discrimination. 20 U.S.C. § 1681(a). The statute does not require that the plaintiff suffer more incidents of harassment after notifying an institution. See Davis, 526 U.S. at 645. Rather, plaintiffs may establish Title IX liability by showing that an institution's deliberate indifference caused them to be harassed *or* made them vulnerable to harassment. See id. (noting that "subject" means "to cause to undergo the action of something specified; expose" or "to make liable or vulnerable; lay open; expose"); see also Farmer v. Kan. State Univ., 918 F.3d 1094, 1103 (10th Cir. 2019) (explaining that the plain language of Davis "clearly indicates that Plaintiffs can state a viable Title IX claim by alleging alternatively either that [a school's] deliberate indifference to their reports of rape caused Plaintiffs to undergo harassment or made them liable or vulnerable to it" (cleaned up)). Here, Doe presented evidence that after she reported the second sexual assault to the College, the school responded with a safety plan that objectively made her vulnerable to additional harassment from Ige. This is sufficient. Accord Davis, 526 U.S. at 644–45.

The court then concludes that Doe has not shown that the College "caused a cognizable harm" and that Doe merely linked her "emotional trauma" to the College's actions. But Doe in fact showed a cognizable harm—she testified in detail about how she altered her academic pursuits, ceased her involvement in campus activities, and limited her physical presence on campus because of Ige's conduct. The jury was entitled to rely on this evidence to conclude that the discrimination Doe endured was "so severe, pervasive, and objectively offensive" that she was deprived of access to the educational opportunities or benefits provided by the College. See Shank v. Carleton Coll., 993 F.3d 567, 573 (8th Cir. 2021).

Our only task in reviewing the district court's denial of a motion for judgment as a matter of law is to determine "whether there is sufficient evidence to support the jury's verdict." Baker, 382 F.3d at 828 (quoting Keenan v. Comput. Assocs. Int'l, Inc., 13 F.3d 1266, 1268 (8th Cir. 1994)). In doing so, we may not "engage in a weighing or evaluation of the evidence." Id. (quoting Keenan, 13 F.3d at 1268). And reversal is appropriate only where "there is a complete absence of probative

-12-

facts to support the verdict" and the record contains "no proof beyond speculation." Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 462 (8th Cir. 2013) (cleaned up). Because there was sufficient evidence in the record for a reasonable jury to conclude that Doe satisfied her burden of proof, I respectfully dissent.

———————————————